842 F.2d 977
 27 ERC 1233, 56 USLW 2502, 18 Envtl.
L. Rep. 20,819
 CONTINENTAL INSURANCE COMPANIES, Appellee,
v.
NORTHEASTERN PHARMACEUTICAL & CHEMICAL COMPANY, INC., Milton
Turkel, Edwin B. Michaels, and John W. Lee, Appellees,
State of Missouri, Intervenor-Appellant.
 No. 85-1940.
 United States Court of Appeals,
Eighth Circuit.
 Submitted May 12, 1987.
Decided Feb. 26, 1988.
Rehearing and Rehearing En Banc Denied May 4, 1988.
 
 Shelly A. Woods, Atty. Gen., Jefferson City, Mo., for appellant.
 Karen Florini, Washington D.C., for amicus U.S.
 Gary R. Long, Kansas City, Mo., for appellee.
 Before LAY, HEANEY, ROSS,* McMILLIAN, FAGG, BOWMAN, WOLLMAN, and MAGILL, Circuit Judges, en banc.
 McMILLIAN, Circuit Judge.
 
 
 1
 This is an appeal from an order entered in the District Court[1] for the Western District of Missouri granting summary judgment in favor of Continental Insurance Cos. (Continental) on count I of its complaint and on the counterclaim filed by the state of Missouri and granting Continental's motion to dismiss without prejudice count II of its complaint. Continental Insurance Cos. v. Northeastern Pharmaceutical & Chemical Co., No. 84-5034-CV-S-4, slip op. at 11, 16 (W.D.Mo. June 25, 1985) (hereinafter district court order). On appeal, a panel of this court affirmed in part and reversed in part. Continental Insurance Cos. v. Northeastern Pharmaceutical & Chemical Co., 811 F.2d 1180 (8th Cir.1987) (hereinafter panel opinion).[2] Subsequently, the court granted the petitions for rehearing en banc filed by Continental and the state. 815 F.2d 51 (1987).
 
 
 2
 For the reasons discussed below, we hold that the term "damages" in the standard-form comprehensive general liability (CGL) policy does not include cleanup costs and accordingly affirm the order of the district court.
 
 FACTUAL BACKGROUND
 
 3
 The following factual summary is taken in large part from the panel opinion, 811 F.2d at 1182-84. A more detailed statement of the factual background of the Denney farm site can be found in the underlying liability decisions, United States v. Northeastern Pharmaceutical & Chemical Co., 579 F.Supp. 823 (W.D.Mo.1984) (EPA ), aff'd in part, rev'd in part and remanded, 810 F.2d 726 (8th Cir.1986), cert. denied, --- U.S. ----, 108 S.Ct. 146, 98 L.Ed.2d 102 (1987).
 
 
 4
 From 1970 to 1972 the Northeastern Pharmaceutical & Chemical Co. (NEPACCO) manufactured hexachlorophene in a factory in Verona, Missouri. (NEPACCO effectively ceased doing business sometime in 1974.) The manufacturing process produced a variety of hazardous wastes, including the highly toxic chemical, dioxin. In July 1971 NEPACCO disposed of about eighty-five 55-gallon drums of hazardous wastes by burying them in a trench on a farm near Verona (hereinafter the Denney farm site). Many of the drums had deteriorated and were in poor condition at the time of disposal; many broke open when they were dumped into the trench. A strong chemical odor persisted in the immediate area of the Denney farm site for several months thereafter.
 
 
 5
 In 1971 or 1972 NEPACCO hired Independent Petrochemical Corp. (IPC) to dispose of more hazardous wastes containing dioxin. IPC in turn hired Russell Bliss to actually dispose of NEPACCO's hazardous wastes. In 1971-1973 Bliss allegedly transported and sprayed the hazardous wastes, mixed with waste oil, as a dust suppressant on the grounds of the Bubbling Springs Stables in Fenton, Missouri, and on the roads of Times Beach, Missouri. In 1974 an individual named Minker bought dirt contaminated with NEPACCO hazardous wastes from the Bubbling Springs Stables to use as landfill on his property located in nearby Imperial, Missouri (the Minker/Stout/Romaine Creek site).
 
 
 6
 From 1970-1972 NEPACCO was insured under three standard-form CGL insurance policies issued by Continental. The first policy was in effect from August 5, 1970, to August 5, 1971, the second policy from August 5, 1971, to August 5, 1972, and the third policy from August 5, 1972, to November 17, 1972, when it was cancelled. Each policy was slightly different, but each provided that Continental would
 
 
 7
 pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of ... property damage to which this insurance applies caused by an occurrence, and [Continental] shall have the right and duty to defend any suit against the insured seeking damages on account of such ... property damage.
 
 The policies defined "property damage" as
 
 8
 (1) Physical injury or destruction of tangible property which occurs during the policy period, including the loss of use thereof at anytime resulting therefrom,(2) Loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period....
 
 
 9
 The policies further provided that "[t]his insurance applies only to ... property damage which occurs during the policy period" and defined "occurrence" as "an accident, including continuous or repeated exposure to conditions, injury or property damage neither expected nor intended from the standpoint of the insured." Only the second and third policies contained the following pollution exclusion clause:
 
 
 10
 It is agreed that the insurance does not apply to ... property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any watercourse or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden or accidental.
 
 
 11
 For general information about standard-form CGL insurance policies, see American Home Products Corp. v. Liberty Mutual Insurance Co., 565 F.Supp. 1485, 1500-03 (S.D.N.Y.1983), aff'd as modified, 748 F.2d 760 (2d Cir.1984), and Note, The Pollution Exclusion Clause Through the Looking Glass, 74 Geo.L.J. 1237 (1986).
 
 
 12
 In 1980 the Environmental Protection Agency (EPA) investigated the Denney farm site. The EPA took soil and water samples and found "alarming[ly] high concentrations of dioxin" and other toxic chemicals. EPA, 579 F.Supp. at 831. The EPA secured and then "cleaned up" the Denney farm site. In August 1980 the federal government filed a lawsuit (the EPA lawsuit) against NEPACCO and others, seeking abatement costs, pursuant to Sec. 7003(a) of the Resource Conservation and Recovery Act of 1976 (RCRA) (also known as the Solid Waste Disposal Act), as amended, 42 U.S.C. Sec. 6973(a). In August 1982 the federal government filed an amended complaint adding claims for injunctive relief and reimbursement of its response costs pursuant to Secs. 104, 106, 107 of the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (CERCLA) (commonly known as Superfund), 42 U.S.C. Secs. 9604, 9606, 9607 (reauthorized and amended in part by the Superfund Amendments and Reauthorization Act of 1986, Pub.L. No. 99-499, 100 Stat. 1613 (1986) (effective Oct. 17, 1986)).[3] We will use the descriptive term "cleanup costs" to refer to both "abatement costs" under RCRA and "response costs" under CERCLA.
 
 
 13
 In January 1984 the district court held NEPACCO and several other defendants, jointly and severally, strictly liable for cleanup costs under CERCLA, but not RCRA. EPA, 579 F.Supp. at 834-37, 839-52. On appeal, a panel of this court affirmed in part, reversed in part and remanded the case to the district court for further proceedings. 810 F.2d at 749-50. The majority held that the federal government could recover cleanup costs under both RCRA and CERCLA. Id. at 732-46. The dissent did not agree that past non-negligent off-site generators or transporters of hazardous waste could be held liable for cleanup costs under the 1984 RCRA amendments or that the corporate officer defendants could be held liable for cleanup costs under RCRA as generators and transporters. Id. at 750-51 (J.R. Gibson, J., dissenting in part).
 
 
 14
 The EPA lawsuit prompted the filing of several other, related lawsuits, including the present case.
 
 
 15
 In March 1983 several former residents of the communities of Times Beach and Imperial filed an action in Missouri state court against NEPACCO and other defendants, seeking damages for present and future personal injury and property damage allegedly caused by the transportation and spreading of hazardous wastes and dirt, contaminated by dioxin and other toxic chemicals produced by NEPACCO, on the roads of Times Beach and at the Minker/Stout/Romaine Creek site. The plaintiffs also sought recovery of the costs of cleaning up the contaminated sites and punitive damages but asserted no RCRA or CERCLA claims. Capstick v. Independent Petrochemical Corp., No. 832-00453 (Mo.Cir.Ct. filed Mar. 7, 1983) (Capstick ).
 
 
 16
 In November 1983 the state filed a lawsuit in federal district court against NEPACCO and other defendants, seeking declaratory judgment and recovery of present and future response costs, pursuant to CERCLA and the common law of public nuisance, in connection with the state's cleanup of the Minker/Stout/Romaine Creek site. Missouri v. Independent Petrochemical Corp., No. 83-2670-C (E.D.Mo. filed Nov. 23, 1983) (IPC ).
 
 
 17
 Somewhat later, in February 1985 the federal government filed a garnishment action in federal district court against Continental, as NEPACCO's liability insurer, to collect the CERCLA cleanup costs the federal government had been awarded in the EPA lawsuit. United States v. Continental Insurance Cos., No. 85-3069-CV-S-4 (W.D.Mo. filed Feb. 25, 1985) (garnishment action). Discovery was consolidated in the garnishment action and in the IPC lawsuit. On June 25, 1985, the same day judgment was entered in the case on appeal, the district court also entered judgment in favor of Continental in the garnishment action. The district court later granted the federal government's motion for reconsideration and the case was held in abeyance pending disposition of the EPA appeal.
 
 
 18
 In the meantime, in February 1984 Continental filed this action seeking a declaratory judgment concerning its liability to NEPACCO arising out of the underlying EPA and Capstick lawsuits. Continental Insurance Cos. v. NEPACCO, No. 84-5034-CV-S-4 (E.D.Mo. filed Feb. 9, 1984). Count I sought declaratory judgment concerning the federal government's EPA lawsuit (cleanup costs for the Denney farm site); count II sought declaratory judgment concerning the Capstick lawsuit (cleanup costs and damages for personal injury and property damage in Times Beach and at the Minker/Stout/Romaine Creek site). NEPACCO and the other defendants failed to enter an appearance or file an answer. As noted earlier, in 1974 NEPACCO had ceased operations; its corporate assets had been liquidated and the proceeds distributed to its shareholders. Thus, by 1984 NEPACCO had been "defunct" for ten years. In November 1984 Continental moved for summary judgment.
 
 
 19
 In December 1984 the state filed a motion for leave to intervene in the present case in order to protect its interests in its related IPC lawsuit. In January 1985 the district court granted the state's motion to intervene, and the state filed an answer and a counterclaim alleging that Continental, as NEPACCO's liability insurer, was obligated to indemnify NEPACCO for any judgment against NEPACCO in the IPC lawsuit. In March 1985 the state filed suggestions in opposition to Continental's motion for summary judgment. Continental later filed a motion to dismiss count II without prejudice; the state filed suggestions in opposition.
 
 DISTRICT COURT DECISION
 
 20
 In June 1985 the district court granted summary judgment in favor of Continental on count I (no liability insurance coverage for Denney farm site cleanup costs sought in the EPA lawsuit) and on the state's counterclaim (no liability insurance coverage for cleanup costs for the Minker/Stout/Romaine Creek site sought in the IPC lawsuit). First, the district court held that, under Missouri law, the time of an "occurrence" is the time the loss or damage is sustained, not the time the wrongful act is committed. District court order at 8 (citations omitted). The district court held that the claims for cleanup costs were not claims for compensation for "property damage." Id. at 10. Although the wrongful acts occurred in 1971-1973, when the policies were in effect, cleanup costs were not incurred until 1980 and 1982, many years after the policies expired. The district court held that the federal and state governments did not suffer any "loss" or "damage" until the cleanup costs were actually incurred. Id. Thus, because there was no "occurrence" of loss or property damage during the policy periods, the district court held there was no coverage. Id. at 11.
 
 
 21
 The district court also decided that summary judgment was not appropriate on count II, with respect to the Capstick lawsuit, because more information was necessary in order to determine whether there was an "occurrence" of bodily injury or property damage, or both, within the policy periods and whether the pollution exclusion applied, and granted Continental's motion to dismiss without prejudice count II of its complaint. Id. at 11-17. The state appealed.
 
 PANEL DECISION
 
 22
 The panel decision reversed in part and affirmed in part. The majority first held the policy definition of "property damage" included contamination of the environment by hazardous wastes, 811 F.2d at 1184-87, and rejected Continental's argument that any "injury" suffered by the federal and state governments from environmental pollution constituted only economic loss. Id. at 1184-89. The majority held that, in addition to the actual owners of the polluted land, water or air, the federal and state governments also sustained "property damage" "because of their '[quasi-sovereign] interest [in natural resources] independent of and behind the titles of its citizens in all the earth and air within [their] domain.' " Id. at 1187 & n. 17, citing Georgia v. Tennessee Copper Co., 206 U.S. 230, 237, 27 S.Ct. 618, 619, 51 L.Ed. 1038 (1907).
 
 
 23
 The majority also expressly rejected the argument raised by amicus curiae American Insurance Association (AIA) that even if environmental contamination had caused "property damage," cleanup costs under CERCLA Sec. 107(a)(4)(A), 42 U.S.C. Sec. 9607(a)(4)(A), were not in themselves recoverable as "damages." 811 F.2d at 1187-90. The majority reviewed the policy language and the statutory language and concluded that "cleanup costs under CERCLA are compensatory damages for 'property damage' within the meaning of the CGL policies." Id. at 1189 & n. 21; see also id. at 1187-88 & n. 17 (citing cases). Cf. EPA, 810 F.2d at 737-40 (abatement costs under RCRA Sec. 7003(a), 42 U.S.C. Sec. 6973(a)).
 
 
 24
 The remaining issue was whether there had been an "occurrence" of "property damage" during the period when the policies were in effect. Although the wrongful acts allegedly occurred during the early 1970's, the federal and state governments did not actually incur any cleanup costs until the early 1980's, many years after the third and last policy had been cancelled. The majority disagreed with the district court's view that the federal and state governments did not suffer any loss or damage until cleanup costs were actually incurred. 811 F.2d at 1190-91 & n. 28 (distinguishing Kirkham, Michael & Assocs. v. Travelers Indemnity Co., 361 F.Supp. 189 (D.S.D.1973), aff'd, 493 F.2d 475 (8th Cir.1974) (per curiam)). The majority predicted that Missouri courts would follow the majority view and adopt the "exposure" theory of coverage, 811 F.2d at 1191-92 & n. 29, and accordingly held that "environmental damage occurs at the moment that hazardous wastes are improperly released into the environment and that a liability policy in effect at the time this damage is caused provides coverage for the subsequently incurred costs of cleaning up the wastes." Id. at 1189 (footnotes omitted).
 
 
 25
 Applying the "exposure" theory, the majority determined that "property damage" occurred at the Denney farm site in July 1971, when the first CGL policy was in effect, when NEPACCO improperly disposed of the hazardous wastes by dumping the barrels in the trench. Id. at 1191. Accordingly, the majority reversed the grant of summary judgment in favor of Continental on count I and remanded for further proceedings to determine whether Continental was liable to indemnify NEPACCO for the award of cleanup costs in the EPA lawsuit. Id. at 1192.
 
 
 26
 Because contaminated dirt from the Bubbling Springs Stable was not used as landfill at the Minker/Stout/Romaine Creek site until 1974, two years after the third CGL policy had been cancelled, the majority held that Continental was under no duty to defend or indemnify NEPACCO for liability arising out of the IPC lawsuit and affirmed the grant of summary judgment in favor of Continental on the state's counterclaim. Id. Finally, the majority agreed with the district court that factual issues in the Capstick lawsuit precluded summary judgment and affirmed the district court's dismissal without prejudice of count II. Id. at 1193.
 
 
 27
 The dissent disagreed with the panel majority only on the issue of whether cleanup costs are "damages" within the meaning of the CGL policies. Id. at 1193-95 (McMillian, J., concurring in part and dissenting in part).
 
 REHEARING EN BANC
 
 28
 Both Continental and the state filed petitions for rehearing en banc. Both petitions for rehearing en banc were granted, and the parties, and several amici curiae, including the federal government, several "hazardous waste generators," the AIA, and several other insurers, filed supplemental briefs.
 
 
 29
 For reversal the state argues that (1) the district court erroneously held "property damage" did not occur until the federal and state governments actually incurred cleanup costs; (2) the plain meaning of the policy term "damages" includes "equitable" monetary relief such as cleanup costs or, alternatively, the policy term "damages" is ambiguous and should be construed against the insurer to include payment of cleanup costs; (3) cleanup costs are merely a measurement of "damages" for "property damage," and the characterization of cleanup costs as equitable for purposes of seventh amendment analysis is inapplicable to questions involving insurance coverage; and (4) finally, the public interest in mitigating environmental pollution and cleaning up hazardous waste sites strongly supports imposing liability for the cleanup costs on the polluters and their insurers. The state also argues that, although it is not necessary to reach the "trigger" of coverage issue on appeal, if the court reaches that issue, Missouri courts would adopt the "injury-in-fact" theory, not the "exposure" theory.
 
 
 30
 Continental argues that (1) the district court correctly held that "property damage" did not occur until the federal and state governments actually incurred cleanup costs; (2) cleanup costs are equitable costs, not legal "damages," and thus are not recoverable under the CGL policies; and (3) cleanup costs constitute economic losses, not "property damage," and thus are not recoverable under the CGL policies. Continental agrees with the state that it was not necessary to reach the "trigger" of coverage issue, but argues that if the court reaches that issue, there was no "occurrence" of property damage within the policy periods because cleanup costs were not incurred until sometime in 1980 at the earliest.
 
 
 31
 The amici curiae have advanced similar arguments. The federal government filed an amicus brief in support of the state, arguing that (1) for purposes of insurance coverage, "property damage" occurs at the time of injury or physical damage to the property itself, not at the time cleanup costs are incurred, and (2) under Missouri law cleanup costs are "damages" which NEPACCO is legally obligated to pay because of "property damage." Several "hazardous waste generators" also filed an amicus brief in support of the state, arguing that insurers are liable for cleanup costs because such costs are "damages." The AIA and several London insurance underwriters filed amicus briefs in support of Continental, arguing that, under the CGL policies in question, (1) cleanup costs are not legal "damages" and (2) cleanup costs constitute only economic losses, not "property damage."
 
 
 32
 The dispositive issue is whether the term "damages" in the standard-form CGL policy includes cleanup costs. We need not reach the other issues raised on appeal, such as whether environmental contamination caused by improper disposal of hazardous wastes constitutes "property damage" or whether Missouri would adopt the "exposure" theory of coverage. However, we agree that environmental contamination caused by improper disposal of hazardous wastes can constitute "property damage." See Port of Portland v. Water Quality Insurance Syndicate, 796 F.2d 1188, 119596 (9th Cir.1986) (oil pollution of water constitutes damage to tangible property); Maryland Casualty Co. v. Armco, Inc., 643 F.Supp. 430, 433 (D.Md.) (holding toxic waste dumps that contaminate the environment cause "property damage"; also distinguishing "property damage" from "damages"), aff'd, 822 F.2d 1348 (4th Cir.1987), petition for cert. filed, 822 F.2d 1348 (1987); Lansco, Inc. v. Department of Environmental Protection, 138 N.J.Super. 275, 350 A.2d 520, 524 (Ch.Div.1975) (oil spill into water caused damage to identifiable physical property), aff'd, 145 N.J.Super. 433, 368 A.2d 363 (App.Div.1976), cert. denied, 73 N.J. 57, 372 A.2d 322 (1977); Kutsher's Country Club Corp. v. Lincoln Insurance Co., 119 Misc.2d 889, 465 N.Y.S.2d 136, 139 (Sup.Ct.1983) (oil spill into water constituted property damage). But see Mraz v. Canadian Universal Insurance Co., 804 F.2d 1325, 1328-29 (4th Cir.1986) (governmental claims for cleanup costs are not claims for damages due to "property damage"), rev'g Mraz v. American Universal Insurance Co., 616 F.Supp. 1173, 1177 (D.Md.1985).
 
 
 33
 We also agree that Missouri would probably adopt the "exposure" theory of coverage. See, e.g., Hawkeye-Security Insurance Co. v. Iowa National Mutual Insurance Co., 567 S.W.2d 719, 720 (Mo.Ct.App.1978), citing Kirchner v. Hartford Accident & Indemnity Co., 440 S.W.2d 751 (Mo.Ct.App.1969); Kissel v. Aetna Casualty & Surety Co., 380 S.W.2d 497, 509 (Mo.Ct.App.1964). However, application of either the "exposure" or "injury-in-fact" theory of coverage would make little difference because of the specific facts presented in the EPA and IPC cases. Cf. Abex Corp. v. Maryland Casualty Co., 252 U.S.App.D.C. 297, 790 F.2d 119, 125 (1986) (asbestos tort cases; following "injury-in-fact" theory adopted in American Home Products Corp. v. Liberty Mutual Insurance Co., 748 F.2d 760, 765 (2d Cir.1984) (coverage triggered when injury actually occurs during policy period, whether or not diagnosable during policy period)). Under the specific facts presented, the crucial events--the improper disposal of the hazardous wastes (wrongful act), the release of hazardous wastes into the environment (exposure), the contamination of the environment (injury-in-fact),--all happened virtually simultaneously. For example, in the EPA case, the improper disposal of the hazardous wastes immediately resulted in their release into the environment in July 1971. Because by definition hazardous wastes are extremely harmful, there was clearly both "exposure" and "injury-in-fact" during the first policy period. In the IPC case the contaminated dirt was not used as landfill at the Minker/Stout/Romaine Creek site until 1974, and thus there was no exposure or injury-in-fact until after the expiration of the third policy period. But cf. Eagle-Picher Industries, Inc. v. Liberty Mutual Insurance Co., 523 F.Supp. 110 (D.Mass.1981), modified, 682 F.2d 12, 17 (1st Cir.1982) ("manifestation" theory; coverage triggered if asbestos-related disease became "reasonably capable of medical diagnosis" during policy period), cert. denied, 460 U.S. 1028, 103 S.Ct. 1280, 75 L.Ed.2d 500 (1983).
 
 
 34
 As a threshold matter, the state argues that we should not consider the "damages" issue because it was raised by the AIA on appeal and was not raised by a party until Continental filed its supplemental brief for rehearing en banc. Ordinarily, we consider only issues argued in the briefs filed by the parties and not those argued in the briefs filed by interested nonparties. See, e.g., Preservation Coalition, Inc. v. Pierce, 667 F.2d 851, 861-62 (9th Cir.1982). Nonetheless, we can consider issues not raised in the briefs or in oral argument, particularly when substantial public interests are involved. See, e.g., Consumers Union v. FPC, 166 U.S.App.D.C. 276, 510 F.2d 656, 662 & nn. 9-10 (1974) (per curiam on petition for rehearing).
 
 
 35
 The "damages" issue is properly before the court en banc. It was expressly raised by the AIA in its initial amicus brief, and the state responded to the AIA's argument in its reply brief. The "damages" issue was considered and discussed at length by the panel majority, 811 F.2d at 1187-89, and the panel dissent, id. at 119395, and in fact was the only point of significant disagreement between the majority and dissenting opinions. Moreover, the broad issue of the availability of liability insurance coverage under standard-form CGL policies for the costs of cleaning up hazardous waste sites is a question of substantial importance not only to liability insurers and their insureds, but to the public as well.
 
 
 36
 This case involves the construction of standard-form CGL insurance policies. "An insuring obligation is a contract, and coverage exists only if assumed by the terms of the policy." Aetna Casualty & Surety Co. v. Hanna, 224 F.2d 499, 503 (5th Cir.1955) (Hanna ). The district court correctly applied the law of Missouri, the forum state. See Klaxon Co. v. Stentor Electric Manufacturing Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Missouri has adopted the most significant relationship test set forth in the Restatement (Second) Conflict of Laws Sec. 188 (1971). See American Institute of Marketing Systems, Inc. v. Brooks, 469 S.W.2d 932 (Mo.Ct.App.1971) (contracts), and is the state with the most significant contacts with the parties and the CGL policies. See, e.g., Havenfield Corp. v. H & R Block, Inc., 509 F.2d 1263, 1267-68 (8th Cir.), cert. denied, 421 U.S. 999, 95 S.Ct. 2395, 44 L.Ed.2d 665 (1975).
 
 Under Missouri law
 
 37
 [t]he rules of construction applicable to insurance contracts require that the language used be given its plain meaning. If the language is unambiguous the policy must be enforced according to such language. If the language is ambiguous it will be construed against the insurer. Language is ambiguous if it is reasonably open to different constructions; and language used will be viewed in light of "the meaning that would ordinarily be understood by the lay[person] who bought and paid for the policy."
 
 
 38
 Robin v. Blue Cross Hospital Service, Inc., 637 S.W.2d 695, 698 (Mo.1982) (banc) (citations omitted); see also Pearce v. General American Life Insurance Co., 637 F.2d 536, 539 (8th Cir.1980) (Missouri law); Bellamy v. Pacific Mutual Life Insurance Co., 651 S.W.2d 490, 495-96 (Mo.1983) (banc).
 
 
 39
 Case law on this issue is sharply divided. Compare Maryland Casualty Co. v. Armco, Inc., 822 F.2d at 1352-55 (under Maryland law, holding "damages" does not cover cleanup costs; citing cases), with New Castle County v. Hartford Accident & Indemnity Co., 673 F.Supp. 1359, 1365-67 (D.Del.1987) (under Delaware law, holding "damages" covers cleanup costs; citing cases). For the reasons discussed below, we hold that the term "damages" is not ambiguous in the insurance context and that the plain meaning of the term "damages" used in the CGL policies refers to legal damages and does not cover cleanup costs.
 
 
 40
 Viewed outside the insurance context, the term "damages" is ambiguous: it is reasonably open to different constructions. Webster's Third New International Dictionary 571 (1971) defines "damages" as "the estimated reparation in money for detriment or injury sustained: compensation or satisfaction imposed by law for wrong or injury caused by a violation of a legal right." The dictionary definition does not distinguish between legal damages and equitable monetary relief. E.g., New Castle County v. Hartford Accident & Indemnity Co., at 1366. Thus, from the viewpoint of the lay insured, the term "damages" could reasonably include all monetary claims, whether such claims are described as damages, expenses, costs, or losses.
 
 
 41
 In the insurance context, however, the term "damages" is not ambiguous, and the plain meaning of the term "damages" as used in the insurance context refers to legal damages and does not include equitable monetary relief. See Maryland Casualty Co. v. Armco, Inc., 822 F.2d at 1352. The CGL policies require Continental to "pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of ... property damage to which this insurance applies caused by an occurrence." (Emphasis added.) "The obligation of the insurer to pay is limited to 'damages,' a word which has an accepted technical meaning in law." Hanna, 224 F.2d at 503. Although not defined in the CGL policies, "[t]he word 'damages' is not ambiguous in the insurance context. Black letter insurance law holds that claims for equitable relief are not claims for 'damages' under liability insurance contracts." Maryland Casualty Co. v. Armco, Inc., 643 F.Supp. at 432, citing Haines v. St. Paul Fire & Marine Insurance Co., 428 F.Supp. 435, 439-41 (D.Md.1977) (applying Maryland law), Hanna, 224 F.2d at 503-04, and Desrochers v. New York Casualty Co., 99 N.H. 129, 106 A.2d 196, 198-99 (1954). But see, e.g., New Castle County v. Hartford Accident & Indemnity Co., at 1365-67 (applying Delaware law; citing cases); United States Aviex Co. v. Travelers Insurance Co., 125 Mich.App. 579, 336 N.W.2d 838, 843 (1983); Broadwell Realty Services, Inc. v. Fidelity & Casualty Co., 218 N.J.Super. 516, 528 A.2d 76, 82-83 (App.Div.1987) (citing cases).
 
 
 42
 This limited construction of the term "damages" is consistent with the provision defining the insurer's obligation as a whole. Continental did not agree to pay "all sums which the insured shall become legally obligated to pay." Continental agreed to pay "all sums which the insured shall become legally obligated to pay as damages." The expansive reading of the term "damages" urged by the state would render the term "all sums" virtually meaningless. "If the term 'damages' is given the broad, boundless connotations sought by the [insured], then the term 'damages' in the contract ... would become mere surplusage, because any obligation to pay would be covered. The limitation implied by employment of the phrase 'to pay as damages' would be obliterated." Maryland Casualty Co. v. Armco, Inc., 822 F.2d at 1352.
 
 
 43
 Such a limited construction of the term "damages" is also consistent with the distinction drawn in insurance law between money damages and injunctive relief. "Traditionally, courts have found no insurance coverage for the costs of complying with an injunction even in cases where the suits could have been brought for damages." Maryland Casualty Co. v. Armco, Inc., 643 F.Supp. at 434. See also Hanna, 224 F.2d at 503-04; Garden Sanctuary, Inc. v. Insurance Co. of North America, 292 So.2d 75, 77-78 (Fla.Ct.App.1974); Ladd Construction Co. v. Insurance Co. of North America, 73 Ill.App.3d 43, 29 Ill.Dec. 305, 307-08, 391 N.E.2d 568, 570-73 (1979).
 
 
 44
 The limited construction of the term "damages" is also consistent with the statutory scheme of CERCLA Sec. 107(a)(4), 42 U.S.C. Sec. 9607(a)(4), which differentiates between cleanup costs and damages. Under CERCLA cleanup costs are not substantially equivalent to compensatory damages for injury to or destruction of the environment. Some cases have overlooked the difference between recovery of cleanup costs under CERCLA Sec. 107(a)(4)(A) (by governments), (B) (by "any other person"), 42 U.S.C. Sec. 9607(a)(4)(A), (B), and recovery of damages for injury, destruction or loss of natural resources under CERCLA Sec. 107(a)(4)(C), 42 U.S.C. Sec. 9607(a)(4)(C). For example, in United States Aviex Co. v. Travelers Insurance Co., 336 N.W.2d at 843 (citations omitted), the court was persuaded that the distinction between recovery of cleanup costs and recovery of damages for damage to natural resources was "merely fortuitous from the standpoint of either [the insured] or [the insurer]." The court reasoned that whether the government chooses to cleanup the pollution itself and then sue to recover its cleanup costs, or sues to recover damages for the damage to natural resources, "[t]he damage to the natural resources is simply measured in the cost to restore the [environment] to its original state," and rejected the argument that the term "damages" should be limited to legal damages and should not include equitable costs. Id.
 
 
 45
 Moreover, the distinction between recovery of cleanup costs and recovery of damages is not "merely fortuitous" to either the insured as a CERCLA and RCRA defendant or to the insurer. The cost of cleaning up a hazardous waste site often exceeds its original value. On the other hand, some natural resources are of exceptional value and their destruction could greatly exceed the cost of cleaning up any hazardous waste contamination. A significant difference between the measurement of liability for cleanup costs and for damage to natural resources could determine whether the government sues for cleanup costs or for damages. See Maryland Casualty Co. v. Armco, Inc., 822 F.2d at 1353,citing Peevyhouse v. Garland Coal & Mining Co., 382 P.2d 109 (Okla.1962) (restoration of strip-mined land cost four times its potential value), cert. denied, 375 U.S. 906, 84 S.Ct. 196, 11 L.Ed.2d 145 (1963); cf. Jack L. Baker Cos. v. Pasley Manufacturing & Distributing Co., 413 S.W.2d 268, 273-74 (Mo.1967) (under Missouri law, measure of damages to real property is lesser of either difference in value before and after injury or cost of restoring property to original condition).
 
 
 46
 Whether the government seeks recovery of cleanup costs, damages for destruction or loss of natural resources, or both, may make little difference to the insured as a CERCLA or RCRA defendant. As noted above, there may be little difference between the dollar amount the insured may have to pay as cleanup costs under CERCLA Sec. 107(a)(4)(A), 42 U.S.C. Sec. 9607(a)(4)(A), and the dollar amount the insured may have to pay as damages under CERCLA Sec. 107(a)(4)(C), 42 U.S.C. Sec. 9607(a)(4)(C). Nonetheless, the type of relief sought is critical to the insured and the insurer, because under the CGL policies the insurer is liable only for legal damages, not for equitable monetary relief, such as cleanup costs. "The insurance contract, which controls the obligations between the parties and therefore centers the focus of this court, is written in terms of the relief sought...." Maryland Casualty Co. v. Armco, Inc., 822 F.2d at 1352. Here, the federal and state governments seek recovery of cleanup costs under CERCLA Sec. 107(a)(4)(A), 42 U.S.C. Sec. 9607(a)(4)(A) (costs of removal or remedial action), and RCRA Sec. 7003(a), 42 U.S.C. Sec. 6973(a) (abatement costs). These lawsuits are essentially equitable actions for monetary relief in the form of restitution or reimbursement of costs. See Maryland Casualty Co. v. Armco, Inc., 822 F.2d at 1352-53; cf. EPA, 810 F.2d at 749 (for purposes of determining seventh amendment jury trial issue; cases cited). The federal and state governments have not sought recovery of "damages for injury to, destruction of, or loss of natural resources," pursuant to CERCLA Sec. 107(a)(4)(C), 42 U.S.C. Sec. 9607(a)(4)(C).
 
 
 47
 Accordingly, we hold that the federal and state governments' claims for cleanup costs under CERCLA Sec. 107(a)(4)(A), 42 U.S.C. Sec. 9607(a)(4)(A), and RCRA Sec. 7003(a), 42 U.S.C. Sec. 6973(a), are not claims for "damages" under these CGL policies.
 
 
 48
 The issues in the Capstick litigation require additional factfinding and analysis and are therefore unsuitable for summary disposition. The private individuals in Capstick seek, in part, recovery of damages for personal injury and property damage due to the improper disposal of hazardous wastes. Cf. CERCLA Sec. 107(a)(4)(C) (damages for damage to natural resources), 42 U.S.C. Sec. 9607(a)(4)(C). These claims are claims for "damages," not cleanup costs, and are covered within the terms of the CGL policies. We express no opinion on the issue of the insurer's liability for claims for damages under the CGL policies.
 
 
 49
 The order of the district court is affirmed.
 
 
 50
 HEANEY, Circuit Judge, with whom LAY, Chief Judge, and FAGG, Circuit Judge, join, concurring and dissenting.
 
 
 51
 The majority opinion appears to be consistent with the panel opinion of this Court, Continental Ins. Co. v. Northeastern Pharmaceutical and Chem. Co., 811 F.2d 1180, 1189 (8th Cir.1987), in all respects, save one. The panel held that under Missouri law the term "damages" in the standard-form comprehensive general liability (CGL) policy includes clean-up costs. Id. at 1189. The majority now disregards established Missouri law and holds to the contrary.
 
 
 52
 We all agree that the question whether clean-up costs are "damages" within the meaning of a CGL policy is an issue of Missouri law. We also agree that under Missouri law:
 
 
 53
 The rules of construction applicable to insurance contracts require that the language used be given its plain meaning. If the language is unambiguous the policy must be enforced according to such language. If the language is ambiguous it will be construed against the insurer. Language is ambiguous if it is reasonably open to different constructions; and language used will be viewed in light of "the meaning that would ordinarily be understood by the layman who bought and paid for the policy."
 
 
 54
 Robin v. Blue Cross Hosp. Serv., Inc., 637 S.W.2d 695, 698 (Mo.1982) (en banc) (citations omitted) (quoting Stafford v. Travelers Ins. Co., 530 S.W.2d 23, 25 (Mo.Ct.App.1975)).
 
 
 55
 Indeed, as this Court has pointed out, Missouri courts:
 
 
 56
 do not necessarily accept the construction accorded to policy terms by astute insurance specialists or perspicacious counsel but rather are concerned with the meaning which the ordinary insured of average intelligence and common understanding reasonably would give to the words or language under consideration.
 
 
 57
 McMichael v. American Ins. Co., 351 F.2d 665, 669 (8th Cir.1965) (quoting Hammontree v. Central Mut. Ins. Co., 385 S.W.2d 661, 666-67 (Mo.Ct.App.1965)).
 
 The majority concedes on page 16:
 
 58
 [F]rom the viewpoint of the lay insured, the term "damages" could reasonably include all monetary claims, whether such claims are described as damages, expenses, costs, or losses.
 
 
 59
 Majority opinion at 985.
 
 
 60
 This concession should be dispositive. The Missouri court en banc has unequivocally held that the language of an insurance policy must be viewed in the light of the meaning that would ordinarily be understood by the lay person who bought and paid for the policy. Robin, 637 S.W.2d at 698.
 
 
 61
 The CGL policy does not define "damages." If the insurer wished to use a technical legal meaning for that term which differed from the accepted dictionary definition, it should have explicitly done so. Thus, to the extent the word "damages" is open to different constructions, it must be accorded the meaning ordinarily given it by the lay person who bought and paid for the policy.
 
 
 62
 Not surprisingly, the majority cites no Missouri case under which this Court may ignore the lay definition of "damages" and substitute in its place a "technical insurance" definition. Instead, the majority rejects the dictionary definition of "damages" on the ground that in the insurance context the word has a technical meaning which does not include the cost of restoring real property to the pre-damage condition. While this may be justified under the law of some states, it certainly is not under Missouri law. The legal definition of "damages" under Missouri law, assuming we were free to recognize that definition, includes the cost of restoring real property to its pre-damaged condition. Jack L. Baker Companies, Inc. v. Pasley Mfg. and Distribut. Co., 413 S.W.2d 268, 273 (Mo.1967).
 
 
 63
 The majority finally argues that black letter insurance law holds that claims for equitable relief "are not claims for 'damages' under liability insurance contracts." It cites Maryland Casualty Co. v. Armco, Inc., 643 F.Supp. 430, 432 (D.Md.1986) (citing Haines v. St. Paul Fire & Marine Insurance Co., 428 F.Supp. 435, 439-41 (D.Md.1977) (applying Maryland law); Aetna Casualty & Surety Co. v. Hanna, 224 F.2d 499, 503-04 (5th Cir.1955); and Desrochers v. New York Casualty Co., 99 N.H. 129, 106 A.2d 196, 198-99 (1954)), in support of this proposition. Then, with the candor that one expects from one's colleagues, the majority cites a number of cases to the contrary: New Castle County v. Hartford Accident & Indemn. Co., 673 F.Supp. 1359 (D.Del.1987) (applying Delaware law); United States Aviex Co. v. Travelers Insurance Co., 125 Mich.App. 579, 336 N.W.2d 838, 843 (1983); Broadwell Realty Services, Inc. v. Fidelity & Casualty Co., 218 N.J.Super. 516, 528 A.2d 76, 82-83 (App.Div.1987) (citing cases). In view of the clear conflict, we doubt that the term "black letter law" is appropriate.[1]
 
 
 64
 The majority places great reliance on Aetna Casualty and Surety Company v. Hanna, 224 F.2d 499 (5th Cir.1955). The case is of doubtful applicability. It simply holds that under Florida law an insurance company cannot be required to defend an action in equity seeking an injunction to prevent the insured from allowing continuing deposits of boulders, trash and dirt on another's land. It did not decide whether the insurer would have been required to reimburse the insured if a judgment for damages had been rendered. In so holding, the Fifth Circuit noted that in Florida the measure of damages is the difference in the property value before and after a trespass. In the case before the Fifth Circuit, the Court found no evidence of a diminution in value as a result of the trespass. Thus, the sole meaningful remedy available was injunctive relief. See Id. at 503.
 
 
 65
 Missouri has not adopted this inflexible rule. It rather permits a plaintiff to recover, as damages, the cost of restoring real property to its pre-damaged condition. Jack L. Baker, 413 S.W.2d at 273.
 
 
 66
 The majority concludes that because state courts are divided on the question of whether recovery may be had from an insurance company for the cost of restoring property, it is free to choose what it feels is the better rule. The fact of the matter, however, is that the Missouri courts have clearly held that the cost of restoring real property is the proper measure of damages where the cost of clean-up does not exceed the value of the property interest damaged. Id.
 
 
 67
 Here, there is no doubt that the cost of cleaning up and abating environmental damage at the Denny farm site is less than the value of the damage to the government's property interest in the environmental resources damaged. Thus, Baker controls. (Moreover, were there any doubt on this issue, we should remand to the district court for a determination of the issue.)
 
 
 68
 The majority is also clearly in error when it states that the limited construction that it gives to the term "damages" is consistent with the statutory scheme of CERCLA, Sec. 107(a)(4), 42 U.S.C. Sec. 9607(a)(4). In so holding, it relies on Maryland Casualty Co. v. Armco, Inc., 822 F.2d 1348 (4th Cir.1987), cert. denied, --- U.S. ----, 108 S.Ct. 703, 98 L.Ed.2d 654 (1988). There, the Fourth Circuit stated:
 
 
 69
 Judicial decisions, although not rejecting the rule of construction that terms of an insurance contract are to be given their ordinary meaning, have nevertheless limited the breadth of the definition of "damages" somewhat more narrowly than the appellant suggests. "Damages," as distinguished from claims for injunctive or restitutionary relief, includes "only payments to third persons when those persons have a legal claim for damages...." Aetna Casualty and Surety Company v. Hanna, 224 F.2d 499, 503 (5th Cir.1955). See also Desrochers v. New York Casualty Company, 99 N.H. 129, 106 A.2d 196 (1954). Thus "damages" is to be construed in consonance with its "accepted technical meaning in law." Hanna, 224 F.2d at 503. Maryland law, which governs the construction of this agreement, has similarly adopted the somewhat narrow, technical definition of damages.
 
 
 70
 Id. at 1352.
 
 
 71
 It is clear that reliance on Armco is misplaced because Maryland law is inconsistent with established Missouri law. Under Maryland law, the term " 'damages' is to be construed in consonance with its" somewhat narrow technical definition of "damages". Id. In Missouri, on the other hand, we must accord the term the meaning that lay persons would give it.[2]
 
 CONCLUSION
 
 72
 A close reading of the cases cited by the majority in support of its view as to the meaning of the term "damages" reveals that they all apply the law of a state which has adopted a restrictive definition of the term "damages." On the other hand, the cases applying state law requiring the words in an insurance policy to be given their ordinary, non-technical meaning support the position of this dissent. See Port of Portland v. Water Quality Ins. Syndicate, 796 F.2d 1188 (9th Cir.1986); New Castle v. Hartford Accident and Indemnity Company, 673 F.Supp. 1359 (D.Del.1987); Consolidated Rail Corp. v. Certain Underwriters at Lloyds, Civ. No. 84-2609 (E.D.Pa. June 5, 1986) (unreported decision available on Westlaw at 1986 WL 6547); Fireman's Fund Ins. Co. v. Ex-Cell-O Corp., 662 F.Supp. 71 (E.D.Mich.1987); Independent Petrochemical Corp. v. Aetna Casualty & Surety Co., 654 F.Supp. 1334 (D.D.C.1986), reconsideration in part denied, 674 F.Supp. 354 (1987); CPS Chem. Co. v. Continental Ins. Co., 222 N.J.Super. 175, 536 A.2d 311 (App.Div.1988); Broadwell Realty Services, Inc. v. Fidelity & Casualty Co., 218 N.J.Super. 516, 528 A.2d 76 (App.Div.1987); City of Thief River Falls v. United Fire & Casualty Co., 336 N.W.2d 274 (Minn.1983); Seaboard Surety Co. v. Ralph Williams Northwest Chrysler Plymouth, Inc., 81 Wash.2d 740, 504 P.2d 1139 (1973). Because Missouri law is clear that words in an insurance policy are to be given their ordinary meaning, we are obligated to do the same.
 
 
 73
 Accordingly, we would adhere to the panel opinion.
 
 
 
 *
 The Honorable Donald R. Ross, active Circuit Judge of this court at the time this case was argued and submitted, took senior status on June 13, 1987
 
 
 [1]
 The Honorable Russell G. Clark, United States District Judge for the Western District of Missouri
 
 
 [2]
 The panel opinion was withdrawn and vacated by order of the court when rehearing en banc was granted. The following discussion refers to and cites the panel opinion because the analysis set forth in the panel opinion is necessary to an understanding of the development of the issues
 
 
 [3]
 The 1986 Superfund Amendments do not affect this appeal
 
 
 [1]
 "Black letter law" is "an informal term indicating the basic principles of law generally accepted by the courts and/or embodied in the statutes of a particular jurisdiction." Black's Law Dictionary 154 (5th ed. 1979)
 
 
 [2]
 It is an interesting sidelight to this case that in applying Maryland law and finding for the insurer, the Armco court noted another action involving damage to property in the same vicinity as that involved in this case. In that action, Judge Scott O. Wright of the United States District Court for the Western District of Missouri appointed a special master, Professor Robert H. Freilich, of the University of Missouri at Kansas City, to help resolve the litigation. See Maryland Casualty Co. v. Armco, Inc., 643 F.Supp. 430, 432-33 (D.Md.1986) (citing United States v. Conservation Chem. Co., 653 F.Supp. 152 (W.D.Mo.1986)). After hearing the matter, Freilich stated that the government's complaint (similar to the complaint in this case) alleged "damages" for purposes of a comprehensive general liability policy. Judge Wright entered an order adopting the special master's recommendation, thus indicating his view as to the proper interpretation of the term "damages" in a comprehensive general liability policy such as the one at issue in this case. The Maryland court, in adopting a narrow technical definition of the term damages, noted that Judge Wright's order was vacated as to Maryland Casualty and two other insurers because they had entered into a settlement before the order was entered. Id. at 432
 More recently, the view of the Maryland court has been criticized. In United States Fidelity and Guaranty Co. v. Thomas Solvent Co., 683 F.Supp. 1139, (W.D.Mich. 1988) the court stated:
 Maryland Casualty rejected the recommendation of the special master who suggested--in my view--a more reasonable view of property damage from the standpoint of the insured. It is clear to me that once property damage is found as a result of environmental contamination, clean-up costs should be recoverable as sums that the insured was liable to pay as a result of property damage. In this context the argument concerning the historical separation of damages and equity is not convincing and it seems to me that the insured ought to be able to rely on the common sense expectation that property damage within the meaning of the policy includes a claim which results in causing him to pay sums of money because his acts or omissions affected adversely the rights of third parties. * * * The short answer is that from the standpoint of the insured damages are being sought for injury to property. It is that contractual understanding rather than some artificial and highly technical meaning of damages which ought to control.
 Id. at 1168.