# HAZEN PAPER COMPANY *vs.* UNITED STATES FIDELITY AND GUARANTY COMPANY.

Hampden. March 7, 1990. - June 14, 1990.

Present: LIACOS, C.J., WILKINS, ABRAMS, LYNCH, & GREANEY, JJ.

*Insurance,* Comprehensive liability insurance, Pollution exclusion clause, Defense of proceedings against insured, Coverage, Construction of policy. *Contract,* Insurance, Construction of contract. *Hazardous Materials. Words,* "Damages," "Property damage," "Damages on account of . . . property damage," "Suit."

In an action by an insured seeking a declaration that its liability insurer was obliged to defend and indemnify it with respect to claims arising from alleged environmental pollution, the record revealed issues of material fact precluding summary judgment as to the applicability of the insurance policies' pollution exclusion clauses. [692]

Language in policies of liability insurance obligating the insurer to "defend any suit against [the insured] seeking damages on account of . . . property damage" to which the insurance applies comprehended a duty to defend the insured against claims asserted in a letter from the United States Environmental Protection Agency alleging that the insured was "potentially responsible" for "actual releases of hazardous materials" at a certain site and setting forth a claim of damages and a demand for participation in remedial action, where, in the circumstances, the opportunity to protect the insured's interests could well be lost before any lawsuit was commenced. [693-697]

Language in a policy of liability insurance obligating the insurer to "defend any suit against [the insured] seeking damages on account of . . . property damage," to which the insurance applies did not obligate the insurer to defend against a claim, asserted in a letter from the Department of Environmental Quality Engineering, stating that the insured was responsible for a threat of the release of allegedly hazardous material at a certain site, but not alleging the occurrence of any actual damage falling within the policy coverage. [695, 698]

Environmental cleanup costs for which an insured was legally responsible and which were incurred in response to demands by a government agency were "damages" within the meaning of language in policies of liability insurance providing coverage for "damages on account of . . . property damage." [698-701]

CIVIL ACTION commenced in the Superior Court Department on October 15, 1986.

The case was heard by *Cortland A. Mathers*, J., on motions for summary judgment.

The Supreme Judicial Court granted a request for direct appellate review.

*Stephen J. Smirti, Jr.*, of New York, & *John D. Lanoue (Edward T. Finneran, III, & David M. Cassidy* of New York, with them) for the defendant.

*Paul F. Ware, Jr. (Nancer H. Ballard* with him) for the plaintiff.

*Thomas W. Brunner, James M. Johnstone, Lyn S. Entzeroth & John W. Cavilia* of the District of Columbia, & *Peter G. Hermes & Molly H. Sherden*, for Insurance Environmental Litigation Association & another, amici curiae, submitted a brief.

*Henry P. Sorett & Anne W. Chisholm*, for Massachusetts Natural Gas Council, amicus curiae, submitted a brief.

*Thomas L. Crotty, Jr., & James E. McGuire*, for Haartz Corporation & others, amici curiae, joined in a brief.

WILKINS, J. Hazen Paper Company (Hazen) brought this action in October, 1986, seeking, among other things, a declaration that its insurer (USF&G) was obliged to defend and indemnify it with respect to claims against Hazen arising out of alleged environmental pollution by a facility to which Hazen had sent solvents for recycling from 1976 to 1979.

In 1983, the United States Environmental Protection Agency (EPA) notified Hazen by letter that Hazen was a potentially responsible party (PRP) under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (42 U.S.C. §§ 9601-9657 [1982]), because of the release of hazardous substances at the Re-Solve, Inc., hazardous waste facility in North Dartmouth; that the EPA and the Massachusetts Department of Environmental Quality Engineering (DEQE) (now the Department of Environmental Protection) had incurred and would incur expenses for remedial action taken in response to releases of hazardous substances at that site; and that they intended to seek from

Hazen, and others, reimbursement for costs incurred and commitments toward the cost of future response measures. In 1986, the DEQE by letter notified the Re-Solve Generators Committee (and Hazen) that, pursuant to G. L. c. 21E (1988 ed.), it was seeking reimbursement for the cost of removing 115 drums of hazardous material from the Re-Solve site.

On cross motions for summary judgment, a judge of the Superior Court ruled that Hazen was "entitled to a declaratory judgment declaring (1) that defendant [USF&G] is obligated to defend Hazen against the claims made against Hazen by the [EPA] and the [DEQE] and to reimburse Hazen for its defense costs incurred to date; and (2) that USF&G is obligated to indemnify and pay on behalf of Hazen any sums for which Hazen is liable as a result of the EPA's and the DEQE's claims." A single justice of the Appeals Court authorized USF&G to appeal from the interlocutory order (a count based on G. L. c. 93A and G. L. c. 176D remained undisposed of). This court granted each party's application for direct appellate review.

USF&G denies any obligation to defend Hazen against the governmental claims, argues that the claims do not fall within the basic recitation of the scope of policy coverage, and asserts that, in any event, the pollution exclusion clause relieves it of any duty to indemnify Hazen with respect to those claims. The applicable USF&G policies, which include standard comprehensive general liability insurance coverage, provide that USF&G will pay all sums Hazen "shall become legally obligated to pay as *damages* because of . . . *property damage* to which this insurance applies, caused by an occurrence, and [USF&G] shall have the right and duty to defend any *suit* against the insured seeking *damages* on account of such . . . property damage" (emphasis supplied). USF&G disclaims any duty to afford Hazen a defense with respect to the claims asserted in the letters of the EPA and DEQE because neither letter involves a "suit" against Hazen within the meaning of the word "suit" in the policy. USF&G denies any duty to indemnify Hazen with respect to claims for reim-

bursement for cleanup costs, arguing that such costs are not "damages" within the policy terms and that, in any event, any amounts payable by Hazen are not amounts Hazen is obliged to pay because of "property damage." The motion judge rejected USF&G's arguments on these points. We agree with him as to the claim asserted by the EPA but not as to the independent claim of the DEQE.

We disagree with the motion judge's allowance of partial summary judgment in favor of Hazen based on his ruling that the policies' pollution exclusion clauses do not apply to the releases of pollutants in this case. In *Lumbermens Mut. Casualty Co.* v. *Belleville Indus.*, *ante* 675 (1990), decided today, we have discussed the same standard form of pollution exclusion clause that is applicable in this case. We interpreted it as providing coverage for damage caused by the discharge or release of pollutants only if the discharge or release was not only accidental but also "sudden," in the sense of an unexpected, abrupt discharge or release. *Id.* at 680. Hazen has not demonstrated, on the summary judgment record, that there is no dispute of material fact as to whether releases or discharges of pollutants at the Re-Solve site, for which Hazen may be responsible, were sudden and accidental. The record is silent on whether the release of any pollutants at that site was sudden and accidental. Consequently, that portion of the declaration of rights that states that USF&G has an obligation to indemnify Hazen with respect to claims for cleanup costs at the Re-Solve site must be vacated. The question whether the release of any damage-causing pollutants was sudden and accidental requires further attention in the Superior Court.[1]

---

[1] We decline to decide whether the summary judgment record demonstrates no dispute of material fact as to whether an occurrence took place within the definition of "occurrence" in the policy. Although one may infer that any discharge of pollutants was "an accident" and the damage caused by such discharges was "neither expected nor intended from the standpoint of [Hazen]," the record is quite bare of relevant facts on which a judge may properly rely in deciding the point on summary judgment. The question is open during further proceedings in the Superior Court.

We shall now turn to an explanation of why the claims asserted by the EPA (but not that independently asserted by DEQE) are (1) ones as to which USF&G had a duty to defend and (2) involve claims for damages because of property damage.

1. USF&G argues that it has no duty to defend Hazen with respect to any claims of the EPA and DEQE until those claims are asserted in a lawsuit. Hazen replies that the letters of notification from those agencies had the same practical effect as the filing of a complaint in a legal action because Hazen's rights and obligations could be substantially affected by actions and determinations occurring before any lawsuit would be commenced.

The policy provides that USF&G has the "duty to defend any suit against [Hazen] seeking damages on account of . . . property damage" to which the insurance applies. In the next section of this opinion we shall discuss whether the governmental claims seek "damages on account of . . . property damage." Here, the question is how we should read the word "suit," which is not defined in the policy. Obviously, on the record no lawsuit has been brought. Literally, there is no suit. That fact alone has been sufficient to provide the answer for some courts. See *Aetna Casualty & Sur. Co.* v. *Gulf Resources & Chem. Corp.*, 709 F. Supp. 958, 960 (D. Idaho 1989) (Idaho law) ("under the plain meaning of the policy terms, no duty to defend has been triggered"); *Technicon Elecs. Corp.* v. *American Home Assurance Co.*, 141 A.D.2d 124, 145-146 (N.Y. 1988), aff'd on other grounds, 74 N.Y.2d 66 (1989). It is, however, not sufficient to provide an answer for us.

By a letter dated May 13, 1983, and addressed to Hazen in Holyoke, EPA notified Hazen "of liability which your company may incur or may have incurred in connection with the Re-Solve Waste Facility in North Dartmouth." EPA said that it had "determined that actual releases of hazardous substances, as defined in [42 U.S.C. § 9601], are occurring at the Re-Solve Facility." EPA and DEQE had spent public funds on "activities in response to these releases." EPA and

DEQE were prepared to contract for the "longer term phases of clean-up of the site," and EPA would undertake further activities "unless EPA determines that such action will be done properly by a responsible party." EPA had concluded, based on the records from the Re-Solve facility, that Hazen might be a responsible party with respect to that site.

EPA wrote that it wished to discuss Hazen's "voluntary involvement in the measures necessary to remedy the problems presented by the hazardous substances at Re-Solve." A superficial view of the EPA letter might lead one to conclude that it is not analogous to a complaint. See, e.g., *Technicon Elecs. Corp.* v. *American Home Assurance Co.*, *supra* at 146 (EPA letter was invitation to voluntary action, not coercive demand letter). The letter continues, however, declaring that "the only form of voluntary involvement" that EPA would consider is "commitment to a complete implementation of all the measures needed on the site proper and reimbursement of the expenses already incurred by EPA and DEQE." It then describes those measures. EPA asked for a written response within thirty days, announced a planned meeting for all potentially responsible parties, and requested (pursuant to 42 U.S.C. §§ 9604 and 6927 [1982]) information and records regarding hazardous substances that Hazen sent to the Re-Solve facility. The letter advised Hazen of criminal penalties for any failure to furnish the requested information. EPA stated that, if it were to receive no response within the next thirty days, it would assume that Hazen "has declined to undertake voluntary response activities at the Re-Solve site."

The question is a close one. The authorities are divided on the point.[2] We conclude that the litigation defense protection

[2]Compare *Fireman's Fund Ins. Cos.* v. *Ex-Cell-O Corp.*, 662 F. Supp. 71, 75 (E.D. Mich. 1987) ("Potentially responsible person" [PRP] letter from governmental agency is a "suit," as is "any effort to impose on the policyholders a liability ultimately enforceable by a court") and *United States Fidelity & Guar. Co.* v. *Specialty Coatings Co.*, 180 Ill. App. 3d 378, 388-389 (1989) (EPA PRP letter obliges insurer to defend) with *Detrex Chem. Indus., Inc.* v. *Employers Ins. of Wausau*, 681 F. Supp. 438, 446-447 (N.D. Ohio 1987) (EPA PRP letter does not meet the attributes

that Hazen purchased from USF&G would be substantially compromised if USF&G had no obligation to defend Hazen's interests in response to the EPA letter. That letter asserts that "actual releases of hazardous substances" were occurring at the Re-Solve site. As will be seen, that allegation sets forth a claim of damages on account of property damage. The letter from the DEQE, however, claims only a threat of the release of hazardous material from certain "overpacked drums" temporarily stored on the Re-Solve site. That letter does not allege the occurrence of any damage that falls within the policy coverage. The DEQE claim, as expressed in the letter, is not the equivalent of a suit. Summary judgment declaring that USF&G was obliged to defend against the DEQE claim was not warranted.

Since the standard policy language was drafted, the EPA processes for the enforcement of obligations to aid in the cleaning up of environmental pollution have moved away from the use of lawsuits toward the use of agency demands for participation in remedial action.[3] Those requests are dan-

---

of a suit, but, because the administrative record would be part of any EPA enforcement action, defense costs expended in developing that record would be reimbursable by the insurer, once EPA action is filed or the EPA issues a remedial order under 42 U.S.C. § 9604 or § 9606) and *Technicon Elecs. Corp.* v. *American Home Assurance Corp., supra* at 145-146 (EPA PRP letter did not institute a "suit" so as to require a defense; it "was an invitation to voluntary action").

For cases holding that demands for action issued by State agencies were "suits," see *Avondale Indus., Inc.* v. *Travelers Indem. Co.*, 887 F.2d 1200, 1206 (2d Cir. 1989) ("A request to participate voluntarily in remedial measures is not the same as the adversarial posture assumed in the coercive demand letter that Avondale received in the instant case"); *Polkow* v. *Citizens Ins. Co.*, 180 Mich. App. 651, 657 (1989) ("subjecting the insured to administrative mechanisms mandating an environmental investigation and cleanup, backed by the power to expose the insured to a money judgment in a court of law, amounts to a 'suit' for purposes of invoking the coverage of the policy"); *C.D. Spangler Constr. Co.* v. *Industrial Crankshaft & Eng'g Co.*, 326 N.C. 133, 153-154 (1990) (issuance of State compliance orders directing remedial action constitutes "suits" within the meaning of the policies). Contra *Patrons Oxford Mut. Ins. Co.* v. *Marois*, 573 A.2d 16, 20 (1990).

[3] See EPA Interim Guidance on Notice, Letters, Negotiations, and Information Exchange Under Section 122 of CERCLA, 53 Fed. Reg. 5298,

gerous for the alleged polluter to ignore because they often result in dispositive, extrajudicial solutions.[4] The consequences of the receipt of the EPA letter were so substantially equivalent to the commencement of a lawsuit that a duty to defend arose immediately. The EPA letter was not the equivalent of a conventional demand letter based on a personal injury claim. See *Aetna Casualty & Sur. Co.* v. *Gulf Resources & Chem. Corp.*, 709 F. Supp. 958, 960 (D. Idaho 1989) (the insureds "point out that the identification of them as PRPs carries more serious consequences than, for example, a demand letter between private parties. For example, they argue that they can be fined for failure to cooperate in the EPA's process of planning the cleanup. Also, if the EPA ultimately recovers the costs of response, defendants' failure to settle prior to commencement of litigation by the EPA could increase the amount of recovery against defendants").

Hazen's obligation to respond positively to the EPA letter was strong. The prospects of avoiding financial responsibility were minimal because liability is not based on fault (§ 9607[a] [1982 & Supp. V 1987]) and the available defenses

5298 (1988) ("A fundamental goal of the CERCLA enforcement program is to facilitate voluntary settlements"); Environmental Protection Agency Interim Enforcement Policy for Private Party Settlements Under the Comprehensive Environmental Response, Compensation, and Liability Act, 50 Fed. Reg. 5034, 5035 (1985) ("Fund-financed cleanups, administrative action and litigation will not be sufficient to accomplish CERCLA's goals . . . voluntary cleanups are essential to a successful program for cleanup of the nation's hazardous waste sites"). See also Strock, Settlement Policy Under the Superfund Amendments and Reauthorization Act of 1986, 58 U. Colo. L. Rev. 599, 616 (1988) ("The theory underlying the Senate settlement amendments was that PRPs were facing incentives which would, in some circumstances, incline them toward litigation and the system toward delay").

[4]See EPA Interim Guidance on Notice, 53 Fed. Reg. 5298, 5302 (1988) (PRP letter "should be used as a vehicle for informing PRPs of the availability of an administrative record that will contain documents which form the basis for the Agency's decision on the selection of a remedy"). The EPA also has the discretion to prepare nonbinding preliminary allocations of responsibility to expedite settlements and remedial actions. 42 U.S.C. § 9622(e)(3)(A) (1982 & Supp. V 1987). Neither this allocation nor any settlement decision based on it is subject to judicial review. § 9622(e)(3)(C) & (E).

are very limited (§ 9607[b]). Moreover, the risk to which Hazen was exposed was substantial because, as a practical matter, its liability is joint and several. See *O'Neil* v. *Picillo*, 883 F.2d 176, 178-179 (1st Cir. 1989), cert. denied sub nom. *American Cyanamid Co.* v. *O'Neil*, 110 S. Ct. 1115 (1990). Early involvement in the settlement discussions is thus often crucial to protect one's interests. Any court action by EPA is limited to the administrative record (§ 9613[j][1] [1982 & Supp. V 1987]), and judicial review considers only whether the EPA "decision was arbitrary and capricious or otherwise not in accordance with law" (§ 9613[j][2]). Thus participation in the development of that record can be crucial. Settlement of EPA claims against potentially responsible parties (see §§ 9613[f][2], 9622[d]), with protection against claims for contribution (§ 9613[f][2]), is a desired goal. The situation was such that the opportunity to protect Hazen's interests could well have been lost, long before any lawsuit would be brought.[5] It would be naive to characterize the EPA letter as a request for voluntary action. Hazen had no practical choice other than to respond actively to the letter.

The early involvement of an insurer in such a process is obviously important to the insured (and very possibly to the insurer), assuming, of course, that the claim is one that falls within the coverage of the policy. We turn now to the question of the extent to which cleanup costs are within the coverage of the policy.

2. USF&G argues that the claims asserted by EPA and DEQE are not within the policy coverage because, in demanding payment of cleanup costs, they are not seeking "damages on account of . . . property damage." The record tells us little about the nature of the pollution at the Re-Solve site and almost nothing about any property damage that the release of pollutants may have caused.

---

[5]Hazen's brief advises us that certain potentially responsible parties involved in the Re-Solve site, including Hazen, settled with the EPA concerning the payment of cleanup costs. On February 9, 1989, the terms of that settlement were included in a consent decree in an action brought by the United States and the Commonwealth.

We have little difficulty, however, in concluding as to the DEQE letter that a claim for the removal of certain stored drums of allegedly hazardous materials does not assert a claim for damages on account of property damage. Certainly, the record does not show the existence of no dispute of material fact whether property damage occurred. Hazen, therefore, was not entitled to a summary judgment declaring that the cost of removing the drums was covered by the USF&G policy. Damages on account of property damage do not include costs incurred in complying with an injunction or order directed to damage prevention or costs incurred in complying with the law, where there has been no property damage. See *Aerojet-Gen. Corp.* v. *Superior Court*, 211 Cal. App. 3d 216, 237 (1989) (response costs for extant pollution, but not for future pollution, are "damages").

As to the EPA claims, the EPA letter asserts that hazardous wastes have been released on the site and that there may have already been off-site groundwater contamination. The contamination of soil and groundwater by the release of hazardous material involves property damage.[6] The area of meaningful dispute is whether cleanup costs incurred in response to property damage are "damages" within the meaning of the policy language. This issue has sharply divided

---

[6]An overwhelming majority of cases recognize that response costs can be incurred on account of property damage. See, e.g., *Continental Ins. Cos.* v. *Northeastern Pharmaceutical & Chem. Co.*, 842 F.2d 977, 983-984 (8th Cir. 1988); *Chesapeake Utils. Corp.* v. *American Home Assurance Co.*, 704 F. Supp. 551, 565-566 (D. Del. 1989); *United States Fidelity & Guar. Co.* v. *Thomas Solvent Co.*, 683 F. Supp. 1139, 1168 (W.D. Mich. 1988); *New Castle County* v. *Hartford Accident & Indem. Co.*, 673 F. Supp. 1359, 1366 (D. Del. 1987); *United States Fidelity & Guar. Co.* v. *Specialty Coatings Co.*, 180 Ill. App. 3d 378, 393-394 (1989); *C.D. Spangler Constr. Co.* v. *Industrial Crankshaft & Eng'g Co.*, 326 N.C. 133, 151 (1990); *Boeing* v. *Aetna Casualty & Sur. Co.*, 113 Wash. 2d 869, 885-887 (1990). Contra, e.g., *Mraz* v. *Canadian Universal Ins. Co.*, 804 F.2d 1325, 1329 (4th Cir. 1986); *Aetna Casualty & Sur. Co.* v. *Gulf Resources & Chem. Corp.*, 709 F. Supp. 958, 961 (D. Idaho 1989).

courts, with the majority tending to hold that cleanup costs are damages.[7]

The question is one of State law. Most State courts of last resort that have passed on the issue have held that environmental cleanup costs, incurred in response to demands of government agencies, are "damages" when there has been a discharge of pollutants that has caused property damage. *C.D. Spangler Constr. Co.* v. *Industrial Crankshaft & Eng'g Co.*, 326 N.C. 133, 152-153 (1990); *Boeing* v. *Aetna Casualty & Sur. Co.*, 113 Wash. 2d 869, 886-887 (1990) ("costs

---

[7]For recent opinions that have held that environmental damage response costs are damages, see, e.g., *Avondale Indus., Inc.* v. *Travelers Indem. Co.*, 887 F.2d 1200, 1207 (1989); *Chesapeake Utils. Corp.* v. *American Home Assurance Co.*, 704 F. Supp. 551, 560-561 (D. Del. 1989); *Aerojet-Gen. Corp.* v. *Superior Court, supra* at 237 ("We concur with the majority of reported decisions that response costs . . . are 'damages because of . . . property damage'"); *United States Fidelity & Guar. Co.* v. *Specialty Coatings Co.*, 180 Ill. App. 3d 378, 391-392 (1989); *United States Aviex Co.* v. *Travelers Ins. Co.*, 125 Mich. App. 579, 589-590 (1983); *Broadwell Realty Servs., Inc.* v. *Fidelity & Casualty Co.*, 218 N.J. Super. 516, 526-528 (1987).

For recent opinions that have held that response costs are not damages, see, e.g., *Continental Ins. Cos.* v. *Northeastern Pharmaceutical & Chem. Co.*, 842 F.2d 977, 986-987 (8th Cir.) (five-to-three decision), cert. denied sub nom. *Missouri* v. *Continental Ins. Cos.*, 488 U.S. 821 (1988); *Maryland Casualty Co.* v. *Armco, Inc.*, 822 F.2d 1348, 1352-1353 (4th Cir. 1987), cert. denied, 484 U.S. 1008 (1988); *Verlan, Ltd.* v. *John L. Armitage & Co.*, 695 F. Supp. 950, 954-955 (N.D. Ill. 1988).

A different Court of Appeal in California distinguished the *Aerojet-Gen.* case, *supra*, from the one before it to the extent that the case before it involved the question whether there was coverage as a matter of law for all "those costs which unambiguously flow from compliance with a mandatory governmental injunction." *AIU Ins. Co.* v. *Superior Court*, 213 Cal. App. 3d 1219, 1232 (1989). That court agreed that there would be coverage where a governmental agency seeks recompense for damage to its proprietary governmental interests in property but rejected coverage for "the costs of compliance with the police power." *Id.*

Unlike the court in the *AIU Ins. Co.* case, we think it unimportant whether the governmental agency is asserting its proprietary governmental interests or the interests of someone else whose property sustained damage because of the discharge of pollutants, or both. As cases, cited above, following the majority rule indicate, it does not matter in deciding the coverage question whether the governmental agency suffered property damage, provided some third party has a claim for damages on account of property damage.

owing because of property damages are remedial measures taken after pollution has occurred, but preventive measures taken before pollution has occurred are not costs incurred because of property damage"). *Compass Ins. Co.* v. *Cravens, Dargan & Co.*, 748 P.2d 724, 728-730 (Wyo. 1988). Contra *Patrons Oxford Mut. Ins. Co.* v. *Marois*, 573 A.2d 16, 18-20 (1990). We join the majority.

When pollution has occurred, cleanup costs are damages within the policy language because in that circumstance the word "damages," which is not defined in the policy, is ambiguous. If there are two rational interpretations of policy language, the insured is entitled to the benefit of the one that is more favorable to it. See *Slater* v. *United States Fidelity & Guar. Co.*, 379 Mass. 801, 804 (1980); *Palmer* v. *Pawtucket Mut. Ins. Co.*, 352 Mass. 304, 306 (1967); *MacArthur* v. *Massachusetts Hosp. Serv., Inc.*, 343 Mass. 670, 672 (1962). It is also appropriate, in construing an insurance policy, to consider what an objectively reasonable insured, reading the relevant policy language, would expect to be covered. See *Home Indem. Ins. Co.* v. *Merchants Distribs., Inc.*, 396 Mass. 103, 107 (1985). Cf. *Bond Bros.* v. *Robinson*, 393 Mass. 546, 551 (1984). On this approach, a reasonable policyholder reading the language would fairly expect that the policy covered amounts he must spend to correct pollution damage for which the law holds him responsible.

We explicitly reject the reasoning of some courts that incorporates "[p]revious judicial interpretations" into the insurance contract to narrow the scope of the word "damages" and thus purport to eliminate any ambiguity. See, e.g., *Patrons Oxford Mut. Ins. Co.* v. *Marois, supra*, at 19; *Maryland Casualty Co.* v. *Armco, Inc.*, 822 F.2d 1348, 1352 (4th Cir. 1987) cert. denied, 484 U.S. 1008 (1988). (technical meaning of "damages" is best approach to policy construction). Lay people should not reasonably be expected to know such limitations. For the same reason, we receive no proper guidance, in construing the word "damages," by recognizing that imposition of an obligation to clean up a site (or to make reimbursement for the cost of doing so) is based on

equitable principles, whereas to lawyers "damages" may refer only to amounts recoverable in an action at law measured by the harm caused to a wronged plaintiff.

Some courts denying coverage have been concerned that response costs might greatly exceed any decrease in the value of the property damaged by pollution. See, e.g., *Continental Ins. Cos.* v. *Northeastern Pharmaceutical & Chem. Co.*, 842 F.2d 977, 986-987 (8th Cir. 1988); *Maryland Casualty Co.* v. *Armco, Inc., supra* at 1353. Others have thought it significant, in denying coverage, that the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (42 U.S.C. §§ 9601-9657) makes a distinction between harm to natural resources (which the courts equate to "damages") and cleanup costs. See, e.g., *Cincinnati Ins. Co.* v. *Milliken & Co.*, 857 F.2d 979, 980 (4th Cir. 1988); *Continental Ins. Cos.* v. *Northeastern Pharmaceutical & Chem. Co., supra* at 987; *Verlan, Ltd.* v. *John L. Armitage & Co.*, 695 F. Supp. 950, 954-955 (N.D. Ill. 1988). Neither of these facts should have any bearing on the meaning of the word "damages" in the policy. If an environmental statute creates liability for the cost of cleaning up a polluted site, it makes no difference either that that measure of liability may exceed common law damages or that, in some instances, the government could seek to recover for damage to natural resources.

The important point is that, if Hazen is legally liable to pay certain amounts because of property damage for which the law holds it responsible, and USF&G is legally obliged to pay "damages on account of . . . property damage," Hazen has policy coverage, subject, of course, to the application of other policy provisions. The summary judgment record is not sufficient, however, to permit a determination of what damage on account of property damage occurred for which USF&G must indemnify Hazen.

3. The interlocutory order declaring the rights of Hazen Paper Company against United States Fidelity and Guaranty

Company is vacated. The case is remanded to the Superior Court for further proceedings.

*So ordered.*