Sanders, J.
This is an action for damages and declaratory relief against Commerce Insurance Company (“Commerce”). Plaintiff William Wasserman, who had a homeowner’s policy with Commerce, asserts that Commerce violated G.L.c. 93A and 176D and breached its contract with him by failing to defend and to indemnify him in connection with an oil spill at his Newton property. The matter came before this Court for jury-waived trial, which took place from May 8, 2002 to May 13, 2002. Based on the credible evidence presented at the trial, I find the following facts.

Findings of Fact

Wasserman is the owner of residential property located at 68 Maple Street in Newton, Massachusetts (the “Property”). The Property is located on a lot which slopes down to Nonantum Road and the Charles River. On February 8, 2000, the heat to Wasserman’s house went off; Wasserman contacted the fuel company, Radiant Fuel ("Radiant”), which supplies him with home heating oil. Radiant checked the fuel tank, which was located outside the house above ground, and found it to be empty. It filled the tank, but the next day, the heat went off again. On checking the tank, Radiant discovered that it was again empty and realized that there was a massive leak in the tank. Between 300 and 400 gallons of fuel oil had leaked out onto the Property in the span of those two days.
Wasserman had a homeowner’s policy (the “Policy”) with Commerce in effect at the time of this incident. He immediately contacted his insurance agent about the spill. Commerce was notified; a claims adjuster, Luanne Manzi, wrote to Wasserman on March 2, 2000 stating that Commerce at that point intended to handle the claim by “reserving all of its rights and defenses” under *171 the Policy, although she also made it clear that Commerce was not acknowledging any coverage. Two weeks later, Commerce issued a notice to Wasserman that it was canceling the Policy, effective April 17, 2000, for the stated reason that the Property was “uninsurable.” The Policy was in fact cancelled. (Wasserman was able to obtain a policy from a different company, however, contrary to Commerce’s conclusion about the Property.)
Sensing that he needed legal assistance, Wasserman contacted a lawyer. The oil spill was reported, as required by law, to the Department of Environmental Protection (“DEP”), and on February 24, 2000, Wasserman’s counsel made the first of many demands on Commerce to indemnify and defend Wasserman. That demand was renewed on March 10, 2000. Manzi wrote in response on March 15, 2000 that Commerce would not agree to coverage at that time: “Until documentation is produced supporting the existence of a threat of migration and thus the possibility of third-party impact, coverage will not be triggered.”
Although no specific provision of the Policy was cited in Manzi’s letter, there are certain sections which are clearly relevant: although the Policy excludes losses to Wasserman’s own Property, the Policy does provide coverage for losses incurred as a result of claims asserted by others. Specifically, Section II (Liability Coverage) Coverage E (Personal Liability) of the Policy states:
If a claim is made or a suit is brought against an “insured” for damages because of “bodily injury” or “property damage” caused by an “occurrence” to which this coverage applies, we will:
1) Pay up to our limit of liability for damages for which the ‘insurer" is legally liable . . .
2) Provide a defense at our expense by counsel of our choice, even if the suit is groundless, false or fraudulent. . .
Section II (Exclusions) subsection 2b, however, excludes from the definition of “property damage” any damage to property owned by the insured.
When Manzi informed Wasserman that Commerce was denying any coverage at that point, she was aware that the DEP was about to issue a Notice of Responsibility (“NOR”). The NOR was indeed issued on April 4, 2000. The NOR is the first step in a lengthy process, set forth in G.L.c. 2 IE, which requires the property owner to take remedial action to clean up the release of any oil or hazardous material substantial enough to trigger liability under G.L.c. 21E, §5A. As part of that process, the property owner must hire a “Licensed Site Professional” or “LSP” who is to assess the site and, where appropriate, to formulate the “Response Actions” which must be undertaken within a certain time frame. Wasserman hired John Clement, an environmental consultant with New England Environmental Technologies Corporation, (“NEET”) to act as LSP. As part of his assessment, Clement dug test pits at the Property to determine the level of any soil contamination, and also installed a monitoring well downhill from the area of the spill to assess groundwater contamination.
With the NOR having been issued, Wasserman’s lawyers again pressed Commerce to indemnify and defend Wasserman. In particular, Wasserman’s counsel advised Commerce of the Supreme Judicial Court’s decisions in Hazen Paper Co. v. USF&G, 407 Mass. 689 (1990), holding that an administrative enforcement order is a damages claim for purposes of liability insurance. Accordingly, Wasserman’s counsel informed Commerce that, based on the applicable case law, the NOR constituted a "claim” under the Policy which triggered a duty to defend Wasserman and to pay for Clement’s work at the Property as well as any other remediation activity undertaken to prevent the fuel oil from migrating off site. As to how significant that risk of off-site migration was, Commerce had by that time received a copy of Clement’s Preliminary Site Evaluation, which expressed a strong concern that the fuel oil would indeed move off the Property. That concern was based on the following: 1) the size of the spill; 2) its location uphill from the Charles River, which was 70 feet from the Property line (150 feet from the spill); 3) the mobility of the oil, which was enhanced by the downward slope of the Property, and discharge of roof drains onto the lot; and 4) the existence of drains and underground utilities which could provide “migration pathways" for the fuel oil.
To assess the validity of Clement’s work and to make its own evaluation as to the potential for third-party impacts, Commerce hired its own investigator, environmental consultant Frank Postma, as well as claims investigator Paul M. McDonagh, of Independent Claims Service, Inc. On March 3, 2000, immediately following a site visit, McDonagh reported to Commerce that “if it is proved that it was the full tank of oil which leaked from the line, there are potential migration problems." Postma visited the Property twice and submitted a written report to Commerce on March 28, 2000. Postma noticed the same site conditions that Clement had — specifically, that the Charles River was nearby and downhill from the spill, and that there were utility lines providing “critical exposure pathways for contamination migration.” He concluded that “the observed conditions present at the site indicate the potential for third-party impacts.” Having himself reviewed Clement’s Preliminary Site Evaluation, he concurred with Clement’s assessment and recommended payment of NEET’s bill for that assessment ($380). No payment was forthcoming.
By this time, the case had been assigned to another Commerce representative, litigation consultant Wayne Garcia. Garcia has legal training and also had access to an in-house attorney, Karen McGillivray, who had some involvement in the decisions that Commerce made in the Wasserman matter. Garcia continued to insist that Commerce had no obligation either to *172 defend Wasserman or to pay for any of the costs associated with the spill. Garcia testified at trial that his position was based on his belief that: a) coverage was triggered only if there was a significant threat of a third-party impact from the fuel oil spill; and b) such a threat did not exist because groundwater contamination had not yet exceeded applicable DEP standards. He was not so clear in his own correspondence with Wasserman and his counsel, however, with the basis for his position seeming to change over time.
For example, in a letter dated May 12, 2000, Garcia cited to a provision of the Policy which was largely irrelevant to Wasserman’s claim.[1] In another letter sent August 16, 2000, Garcia stated that Commerce had no duty to indemnify or defend Wasserman because no third-party claim had been made — a statement that Garcia at trial acknowledged was in error since the NOR was in fact such a claim. He also continued to insist that “the Wasserman’s [sic] have yet to prove that the contamination in any way threatens to migrate off site,” despite having received both the Clement and the Postma reports setting forth the reasons why there was such a potential at the Property.[2] Garcia continued to insist that Commerce was handling the case under a “reservation of rights,” although it was unconditionally denying any duty to defend Wasserman at that point. Garcia concluded his letter by refusing to pay any legal bills since “there was no defense to take over.”
In the meantime, work required by DEP regulations was proceeding on the Properly. On April 24, 2000, Clement submitted an Immediate Response Action Plan, followed by an Immediate Response Action Report dated June 23, 2000; both contained laboratory analyses of soil samples taken from the test pits at the Property and of groundwater taken from the single monitoring well. Those results showed both soil and groundwater contamination, although the groundwater contamination did not exceed standards set by DEP. These results did not reassure Clement, however. Indeed, he remained convinced (and continues to remain convinced to this day) that the threat of offsite migration remained significant.
The specific bases for Clement’s conclusion that this substantial threat exists were set forth in reports which were provided to Commerce. Specifically, Clement noted that an examination of the area around the tank showed that the oil had migrated almost immediately in a downward direction, becoming horizontal in its movement at a depth of five feet below the surface. Thus, its movement was not on the surface but below it, so that movement through the groundwater was more likely to occur. In addition, Clement had discovered an old drain pipe of an unknown origin which emerged near the Charles River coming from the direction of the Property. The risk that the plume of contamination could come into contact with an underground conduit, like this pipe, increased the potential for off-site migration of the oil. That tests had failed to turn up any large amount of oil did not reassure Clement, since that indicated to him that indeed the oil had already found a “migration pathway.”
On January 8, 2001, Wasserman’s lawyer sent to Commerce a demand letter, pursuant to G.L.c. 93A and 176D, setting forth the various ways in which Commerce had violated those statutes. This letter put Commerce on clear notice of the claims that Wasserman intended to assert under those statutes. The letter further demanded that Commerce pay the $7,470 in bills from NEET incurred as of that date for investigation and remediation assessment work required by the DEP, as well as the legal bills Wasserman had been forced to incur to enforce his rights under the Policy and to defend against the NOR claim. Commerce now acknowledges that it was (and is) obligated to pay for the NEET’s fees for Clement’s assessment work, and at least some portion of the legal bills (which Commerce now pegs at $10,971.62 — far less than the actual amount of the fees). In response to the January 2001 demand letter, however, Commerce offered nothing: Garcia continued to insist that Wasserman bore all responsibility “because there is no one bringing an action against the Wasserman’s [sic].” The Complaint in the instant case was filed in February 2001.
Coincidentally, around the same time that suit was filed, Garcia changed his position with respect to the obligation to defend against the NOR, and decided, after consulting with counsel, that indeed the NOR did trigger a duty to defend. However, no one from Commerce notified Wasserman or his counsel about this reversal in Commerce’s position until July 2001, some six months after suit was filed, nor was any explanation offered at trial for this delay. In July 2001, eighteen months after the original spill, Commerce for the first time acknowledged to Wasserman its responsibilities with respect to defending Wasserman in connection with the NOR, citing in a letter from its counsel the very same case (Hazen Paper) that Wasserman’s lawyer had cited to Garcia more than a year before. Although Commerce agreed to pay reasonable legal fees “directly related” to defending the NOR, it did not offer to pay any specific amount, even though it had been receiving Wasserman’s legal bills (redacted to protect against the disclosure of attorney-client communications). It also agreed to pay the “reasonable costs” incurred in evaluating the Property and the extent of contamination, but again did not offer any specific amount, even though Commerce had long been in possession of the invoices Clement had sent in connection with NEET’s assessment work, with Commerce’s own consultant, Postma, recommending payment. Commerce continued to deny that it had any duty to pay cleanup costs “until it is determined that there is an actual imminent threat of migration and impact on third-party property,” which Commerce concluded the data did not support.
Shortly before receiving the July 2001 letter from Commerce, Wasserman received a Notice of Noncompliance from DEP, stating that he had failed to take the *173 steps required of him by DEP regulations to clean up the spill reported the year before and that his continued failure to take remedial action subjected him to administrative penalties. Wasserman, a book store clerk earning a modest salary, was unable himself to pay the cost of a cleanup, particularly given the costs he had already been saddled with as a result of Commerce’s failure to pay anything. To avert these penalties, Wasserman’s lawyers did the legal work required to file an application of financial inability. See 310 C.M.R. §40.0172. I find that this legal work was necessitated by Commerce’s failure to fulfill its obligations under the Policy and was part of his defense to the NOR which Commerce should have provided. Wasserman’s counsel also pursued a claim against Radiant and Crown Fuel Tanks, since the Notice of Responsibility placed the obligation to pursue any third parties on Wasserman, who would be held ultimately responsible by the DEP for the cleanup. Wasserman’s lawyers brought this all to Commerce’s attention. Commerce did not offer to assist with regard to any of these efforts.
At some point late in 2001, Commerce did agree to pay the cost of digging two additional wells at the Property. Results from the two wells from which groundwater samples could be obtained showed groundwater contamination (although not in an amount which exceeded DEP standards). On the eve of this trial, remediation work at the Property began. In the course of this work, a sample of water and soil was collected from an area 10 feet below the surface where the leak occurred. This sample (introduced into evidence at trial) bore the distinctive odor of fuel oil. Clement, the LSP, testified that in his expert opinion, the threat of migration off site remains substantial, and can be alleviated only by a cleanup at the Property. I credit that testimony. The estimated cost of such cleanup (removing any contingencies which could increase the cost) is $59,000. Environmental assessment and remediation costs to date (taking into account Commerce’s recent contributions) are $7,090.
Evidence as to Wasserman’s attorneys fees was also introduced at trial. I find these fees to be reasonable in amount and attributable to the following work:
a. Wasserman incurred $10,971.62 in fees to have Holland & Knight respond to the NOR and the Notice of Noncompliance, as well to coordinate with the LSP in order to develop a response to DEP’s demands. Commerce concedes that Wasserman is entitled to recover these fees.
b. An additional $5,611 in attorneys fees was incurred to prepare a financial inability application for Wasserman and to pursue a finding in that regard so as to avoid the imposition of administrative penalties. I find and conclude that these are costs which, if Commerce had properly fulfilled its duty to defend Wasserman against the NOR, Wasserman would not have incurred. .
c. Wasserman incurred $17,321.00 in fees to have Holland & Knight pursue Radiant and Crown Fuel Tanks. Had Commerce fulfilled its duty to defend Wasserman against the NOR, an attorney chosen and paid for by Commerce would have pursued these parties, as Holland & Knight did, to pay for the cleanup costs which the NOR required Wasserman to expend in order to comply with DEP directives.[3]
d. Wasserman incurred an additional $50,741.95 to have his lawyers pursue his claims against Commerce. Of that amount, approximately $25,370.97 was spent trying to enforce Commerce’s duty to defend him under the Policy.

Rulings and Conclusions of Law

Plaintiff contends (in Count I of the Complaint) that defendant breached its obligations under the Policy by: a) failing to defend against the NOR issued by the DEP; and b) failing to indemnify him for the costs associated with defending against that claim and for refusing to indemnify him for the prospective cost of cleaning up the spill itself. Plaintiff also contends (in Count II) that Commerce’s conduct violated both G.L.c. 93A and G.L.c. 176D, and that these violations were knowing and wilful, entitling him to treble damages plus attorneys fees. Finally, plaintiff (in Count III) seeks a declaration from this Court that Commerce is required to pay for all the costs of cleanup which Wasserman has not yet incurred but will be forced to incur to comply with DEP’s directives. I conclude that both the facts and the law support a judgment in plaintiffs favor on all of these claims.
Some portion of these claims Commerce does not dispute. At trial, Commerce acknowledged that it did in fact have a duty to defend Wasserman once the NOR was issued against him. Despite Garcia’s statements to the contrary, the NOR is considered a “claim” under the applicable case law which triggers an obligation on the part of the insurance company to defend. See Hazen Paper, 407 Mass. 689. Commerce further acknowledged at trial that this failure entitled Wasserman to recover the remediation assessment fees to date of $7,090, as well as the $10,971.62 in attorneys fees directly attributable to developing a Response to the NOR and the Notice of Noncompliance. What Commerce sharply disputes, however, is any liabilify for the costs of actually cleaning up the fuel spill. It also takes issue with Wasserman’s claim that he is entitled to recover the balance of any attorneys fees, and it denies all liability for any 93A violation or 176D violation. The Court will discuss each of these issues in turn.

A. Cleanup Costs

While now acknowledging its obligation to defend Wasserman in connection with the NOR, Commerce denies that it has breached any duty to indemnify Wasserman. The duty to indemnify is narrower than the duty to defend, since it depends on whether the actual facts of the events in issue concern matters covered by *174 the policy, not whether the claim against which the insured is defending is “reasonably susceptible” to an interpretation that it could, under some set of possible facts, fall within the policy’s terms. Compare Sterilite Corp. v. Continental Casualty, Co., 17 Mass.App.Ct. 316 (1983), to Liberty Mutual Ins. Co. v. SCA Serv., Inc., 412 Mass. at 332. Thus, that Commerce was required to defend Wasserman in connection with the NOR does not mean that it was likewise required to indemnify him for the clean up costs beyond those assessment costs necessary to develop a response. In denying any obligation to indemnify, Commerce relies on the provision in the Policy which excludes properly damage to the insured’s own property. See Section II (Exclusions) subsection 2b. As a result of this provision, Commerce argues, it is not liable for the cleanup costs unless there is a substantial threat of offsite migration. The law supports Commerce’s position on this issue. The facts, however, do not.
The leading case in this area is Hazen Paper Company v. USF&G, 407 Mass. 689 (1990). In that case, the Supreme Judicial Court (“SJC”) concluded that an insurer had a duty to defend its insured against an administrative claim filed by the Environmental Protection Agency (“EPA”), even though the insurance policy imposed only a duty to defend against any “suit.” With respect to the obligation to indemnify the insured, that turned on whether certain costs could be considered to be “damages on account of.. . property damage” of the type which the policy covered. The SJC distinguished between those costs taken only as a preventative measure (that is, where no actual discharge of pollutants has occurred) and those costs incurred to actually clean up environmental pollution: the former could not be considered to be “property damage” within the meaning of the policy, whereas the latter were. The Court concluded that the defendant insurer was liable for the costs of cleaning up a polluted site since those costs fell within the meaning of “properly damage” for which the insured Hazen had insurance coverage, “subject, of course, to the application of other policy provisions.” 407 Mass. at 701.
In the instant case, there are indeed other policy provisions which must be considered: that is, Wasserman’s Policy specifically excluded from the definition of “property damage” that damage which is sustained only to the insured’s own property. As to whether this “owned property” exclusion applies, there are two cases which this Court finds to be particularly instructive; these cases interpret an almost identical policy exclusion in the context of an environmental cleanup.
The first case involved a situation where off-site contamination had already occurred. In Hakim v. Massachusetts Insurer’s Solvency Fund, 424 Mass. 275 (1997), the SJC held that, although cleanup costs incurred for the sole purpose of cleaning up the insured’s property would be barred by the owned property exclusion, “coverage is not barred if the cleanup is designed to remediate, to prevent or to abate further migration of contaminants to the off site properly.” 424 Mass. at 279. Thus, the SJC found that the location of the cleanup was largely irrelevant: the insurer was liable for all the clean up costs, including the cost of cleaning up the insured’s property, so long as the purpose was to prevent further migration. In the second case, the Appeals Court determined that the insurer’s liability is triggered “even if the contaminating substances are solely on the insured’s land.” Rubenstein v. Royal Insurance Company of America, 44 Mass.App.Ct. 842, 854 (1998). The Court explained:
In soil contamination situations ... it is often only the insured’s property which is contaminated at the time the cleanup commences. Disposing of hazardous materials is often undertaken at least partially to prevent damage to adjoining property. It would serve “no legitimate purpose to assert that soil and ground water pollution must be allowed to spread over boundary lines before they can be said to have caused the damage to other people's property which liability insurance is intended to indemnify.” Allstate Insurance Co. v. Guinn Construction Co., 713 F.Supp. 35, 41 (D.Mass. 1989). Discouraging cleanups by the property owner or other responsible parties by precluding . . . [liability] insurance coverage until contamination has migrated or flowed on to someone else’s property runs afoul of the general preference within environmental statutes toward preventative action.
Ibid. When these cases are read together, they stand for the proposition that an insurer will be liable not only to defend an insured against an NOR but also to indemnify the insured for all cleanup costs, even with an “owned property” exclusion, so long as there is a significant threat of off-site migration.
As my fact findings indicated, there was (and is) a substantial threat that the fuel oil which leaked onto Wasserman’s Property will migrate (or has already begun to migrate) off-site. Commerce’s own expert, Postma, concluded as much in March 2000 when he was asked to evaluate the work of Wasserman’s consultant Clement and determine the legitimacy of Clement’s findings. The facts which supported these experts’ conclusions included the size of the spill, its location up hill from the nearby Charles River, the mobility of the oil, and the existence of drains and underground utilities providing critical “migration pathways.” All of these facts, together with the experts’ conclusions that a threat of off-site migration existed, were provided to Commerce within a couple of months of the spill.
Commerce points out that the levels of contamination in the groundwater samples do not exceed DEP standards. It also notes that more than two years after the spill, there is no proof that the threat of off-site migration has become a reality. That does not change this Court’s conclusion that Commerce must pay for the clean up costs. First, it is this Court’s view that the relevant time at which the significance of the threat *175 should be evaluated is the spring of 2000, when both experts (including Commerce’s own consultant) concluded that such a threat existed. An insurer faced with such information should not be rewarded by waiting to see if the migration actually occurs: as the Appeals Court in Rubenstein pointed out, that would discourage prompt cleanup of environmental spills. Moreover, even as of today, there is sufficient evidence before the Court to warrant the conclusion that off-site migration remains a threat. As Clement himself noted, that the tests have not detected a large quantity of fuel oil in the samples taken from Wasserman’s Property only reinforces his conclusion that the risk of off-site migration is substantial. It is in fact likely that the delay in cleaning up the spill has meant that the great bulk of the oil has already moved elsewhere.

B. Actual Damages

Acknowledging that it had a duty to defend Wasserman in connection with the NOR, Commerce concedes that it is liable for assessment costs related to Clement’s work ($7,090) and is responsible for paying that portion of the attorneys fees Wasserman has incurred in defending himself against the NOR. Commerce contends those fees should be limited to the $ 10,971.62 Wasserman had obligated himself to pay Holland & Knight to respond to the NOR and the Notice of Noncompliance, and to coordinate with the LSP to develop that response. I conclude that the amount should also include the $5,611 expended to prepare a financial inability application and pursue a finding in that regard so as to avoid the imposition of administrative penalties.
I further conclude that Wasserman’s actual damages should include the fees incurred in pursuing Radiant and Crown Fuel Tanks ($17,321.00). As I found above, an attorney chosen and paid for by Commerce would have pursued these parties to pay for the cleanup costs. The NOR placed the responsibility on Wasserman to pursue these other parties so that Wasserman’s attempts to get their contribution so as to eliminate or diminish his own liability to DEP is thus inextricably intertwined with his defense to the NOR. See Oscar W. Larson Co. v. United Capitol Ins. Co., 845 F.Sup. 458, 460-61 (W.D.Mich. 1993); Safeguard Scientifics, Inc. v. Liberty Mutual Ins. Co., 766 F.Sup. 324, 333-34 (E.D.Pa. 1991), aff'd, in relevant part, 962 F.2d 209 (3d Cir. 1992) (holding that insurers’ duty to defend includes counterclaims and cross claims). Wasserman is entitled to a complete defense, and that includes efforts to pursue any responsible parties.
Wasserman also urges that I include as part of the actual damages (for purposes of calculating multiple damages under 93A) some portion of the attorneys fees incurred in pursuing this lawsuit. Counsel estimates that half of those fees, or $25,370.97, are attributable to work related to establishing Commerce’s duty to defend and its breach thereof. As the SJC has recently established, an insured who is put to the expense of establishing the insurer’s duty to defend under the policy through a declaratory judgment action is entitled to recover attorneys fees incurred in prosecuting that action, regardless of whether the insurer acted in bad faith. See e.g. Preferred Mutual Ins. Co. v. Gamache, 426 Mass. 93 (1997); see also Hanover Ins. Co. v. Golden, 436 Mass. 584 (April 26, 2002). Whether those fees become part of the insured’s actual damages for purposes of calculating multiple damages under 93A, however, has not been directly addressed by the SJC. In the absence of precedent, this Court declines to consider those fees part of Wasserman's damages, particularly since this lawsuit sought much more than a simple declaration that Commerce had a duty to defend Wasserman against the NOR. Chapter 93A allows a plaintiff to recover attorneys fees upon proof of a 93A violation; to make those fees part of the damages seems to go beyond what the legislature intended.
Actual damages on the breach of contract Count (Count I) thus total $40,183.62.
C. Chapter 93A/176D Violations
Chapter 93A, §2(a) makes unlawful any unfair acts or business practices; G.L.c. 93A, §9 provides a private right of action to recover for losses caused by such acts, together with attorneys fees and multiple damages if the violation is knowing or wilful. Chapter 176D, §3(9) prohibits unfair claim settlement practices and delineates specific acts or omissions constituting such practices. A violation of Chapter 176D also constitutes a violation of G.L.c. 93A.
A good faith disagreement between an insurer and its insured will not support a finding of liability under either 93A or 176D. Lazaris v. Metropolitan Property and Casualty Co., 428 Mass. 502, 504 (1998); Lumbermen Mut. Casualty Co. v. Offices Unlimited, Inc., 419 Mass. 462, 468 (1995). Neither will liability exist if the insurer in good faith relied on a plausible, but ultimately wrong interpretation of its own policy. Boston Symphony Orchestra v. Commercial Union Insurance Co., 406 Mass. 7, 15 (1989). Where an insurer’s liability to an insured is "reasonably clear,” however, then its failure and refusal to settle is an unfair and deceptive act. O'Leary v. Metropolitan Property and Casualty Ins. Co., 52 Mass.App.Ct. 214 (2001). In deciding whether liability was “reasonably clear,” this Court applies an objective test: would a reasonable person in the insurer’s position, with knowledge of the relevant facts and law, have concluded that the insurer was liable to its insured on the policy? Id. Applying this test to the facts that I have found, I conclude that Commerce’s breach of its contract with Wasserman, both in failing to defend him and in failing to indemnify him constituted violations of 93 A and 176D.
In failing to fulfill its duty to defend Wasserman in connection with the NOR, Commerce’s liability under these statutes is not only clear, but its conduct also supports the conclusion that the violations were knowing and wilful. Commerce initially refused to recognize any duty to defend against the NOR, taking the wholly erroneous position that the NOR did not constitute a *176 “claim or suit” under the Policy. This position was specifically rejected in Hazen Paper Company v. USF&G, 407 Mass. 689, some ten years before. Wasserman’s counsel called Commerce’s attention to the Hazen Paper case as early as March 2000, without effect. Although Garcia had legal training and consulted with in-house counsel McGilivray, he continued to insist, as he stated in his August 2000 letter to Wasserman’s counsel, that there was “no defense to take over.” He claimed that Commerce was handling the matter under a “reservation of rights” when in fact Commerce was denying that it had any obligation to do anything. Even worse, Garcia acknowledged that he realized his error in February 2001 (when this lawsuit was filed), but inexplicably did not notify Wasserman or his counsel that he now believed the NOR constituted a "claim” under the Policy which triggered a duty to defend. It was not until July 2001 that defense counsel corrected the previous statements of Commerce and acknowledged that defendant had a contractual obligation to defend the plaintiff against the NOR and pay all associated costs, including the assessment costs incurred in connection with responding appropriately to the NOR. Even then, however, Commerce did not take steps to pay for any of the legal fees to date, even though it had received regular bills reflecting those amounts, nor did it pay the remediation assessment costs which had been clearly documented months before and which its own consultant, Postma, had recommended that it pay. Finally it made no offer to take over Wasserman’s defense, and continued to dispute the extent of its obligations, refusing for example to participate in Holland & Knight’s efforts to pursue Radiant, or to pay for the legal work on a submission to DEP showing Wasserman’s financial difficulties.
With respect to Commerce’s breach of its duty to indemnify Wasserman, Commerce’s conduct is not as egregious but nevertheless a violation of Chapter 176D. As of the spring of 2000, all the information that Commerce had in its possession showed that there was a substantial risk of off-site migration. Indeed, its own expert concluded as much. In the face of this information, Garcia was less than straightforward with Wasserman: in denying coverage, he first relied on a provision which was not relevant, then took the position, in the face of clear case law to the contrary, that there was no duty for Commerce to take any action with respect to the NOR. Commerce eventually decided to abandon that wholly erroneous position, but failed to communicate that change of heart to Wasserman in a timely fashion. Commerce (through counsel) then seized on the level of groundwater contamination as the reason why it was refusing to pay any of Wasserman’s costs. This Court can discern no basis in the facts or the law that this single factor is decisive of whether a threat of off-site migration exists for purposes of determining an insurer’s liability, however. At no time did Commerce offer to pay Wasserman anything towards clean up costs, or offer anything whatsoever until some eighteen months after the spill. In sum, the facts warrant the conclusion that Commerce, despite its claim that it was proceeding under a reservation of rights, was unwilling to live up to its responsibilities to its insured unless and until Wasserman went to the expense of getting a Court to force it to do so.

Conclusion and Order

For all the foregoing reasons, is hereby ORDERED that judgment enter for the plaintiff:
1) On Count I (breach of contract), in the amount of $40,183.62;
2) On Count II, attorneys fees in the amount of $50,741.95 plus treble damages for the defendant’s breach of its duty to defend the plaintiff totaling $120,550.86.
As to Count III seeking declaratory relief, it is hereby DECLARED that the defendant is obligated to pay any future costs to Wasserman in defending against the NOR and is required to indemnify him for the cost of cleaning up the Property, as required by the Policy.
As to the date from which prejudgment interest runs, the clerk will use the date on which this action was commenced unless plaintiff can establish, under the principles enunciated in Sterilite Corp. v. Continental Casually, Co., 397 Mass. 837 (1986), and based on the evidence nowbefore the Court, that a different date (or dates) should be used. Plaintiff must submit any request that a different date be employed within 10 days of plaintiffs receiving notice of this decision, with any opposition submitted 10 days thereafter.
This Court is also aware that the evidence concerning attorneys fees did not include counsel’s time at trial and immediately thereafter. Counsel may submit a request, within 10 days, to have the amount of attorneys fees assessed on Count II increased so as to reflect this additional time.

 Garcia cited a provision of the policy which excluded coverage for losses caused by wear and tear, contending that the leak was caused by Wasserman’s failure to maintain the tank. Subsequent correspondence from Commerce made no further mention of this provision, which, as Wasserman’s counsel pointed out, had no bearing on Commerce's obligations vis a vis the NOR.

Garcia did not base this on the level of groundwater contamination but rather stated that there was no risk of migration because “the Charles River is a tidal river [and]... as the river rises and flows, it should keep the oil in place.” This peculiar conclusion is not based on any information provided by any expert, nor is the Court aware of any factual support for it.

Those efforts have apparently borne fruit, with Radiant agreeing to pay a substantial amount towards the cleanup costs. Because I conclude that Commerce is responsible for indemnifying Wasserman for those costs, it seems particularly appropriate that Commerce foot the bill for services which will ultimately reduce its own liability.