WHITTAKER CORPORATION

v.

AMERICAN NUCLEAR INSURERS

v.

Textron, Inc.

Civil Action No. 07–10515–RGS.

United States District Court,
D. Massachusetts.

Dec. 1, 2009.

Melissa C. Allison, Arthur P. Kreiger, Anderson & Kreiger LLP, Cambridge, MA, for Textron, Inc.

Thomas W. Brunner, Richard Ifft, Wiley Rein LLP, Washington, DC, Owen Gallagher, Gallagher & Associates, P.C., Boston, MA, Garrett J. Harris, Gallagher & Associates, P.C., Malden, MA, for American Nuclear Insurers.

Michael J. Carpentier, Mary K. Ryan, Nutter, McClennen & Fish, LLP, Boston, MA, Reynold L. Siemens, Proskauer Rose LLP, Los Angeles, CA, for Whittaker Corporation.

*MEMORANDUM AND ORDER ON CROSS–MOTIONS FOR SUMMARY JUDGMENT*

STEARNS, District Judge.

The court is asked to decide the extent to which defendant American Nuclear In-

surers (ANI), is obligated to address environmental contamination at a nuclear waste facility (Nuclear Metals Site or Site) operated by a succession of companies, including plaintiff Whittaker Corporation (Whittaker) and third-party defendant Textron, Inc., in West Concord, Massachusetts. The issue is joined in cross-motions for summary judgment that pit ANI against Whittaker and Textron in a battle over remediation costs at the Site. The court heard oral argument over two days in April of 2009. On September 15, 2009, the court issued a Memorandum and Order ruling on the parties' cross-motions. The court found, *inter alia,* that there were genuine issues of material fact with regard to whether an Endorsement to ANI's policy limiting liability for environmental cleanup costs had been properly issued. The court further ruled that ANI had an interim duty to defend Whittaker and Textron in the ongoing remediation dispute. Finally, the court found that ANI had complied with the requirements of Mass. Gen. Laws ch. 175, § 111A, pertaining to notices of a reduction in coverage in issuing the Endorsement. *See* Memorandum and Order of September 15, 2009, at 7 n. 6.

The parties have now filed motions for clarification and/or reconsideration (Whittaker and Textron), and for reconsideration (ANI). ANI argues that the court erred in finding a duty to defend before making a determination as to which version of the Policy applies. On this issue, the court had held that whether "Endorsement 112 was properly added to the Facility Form is the factual issue that must be resolved before the court can determine whether Whittaker and Textron are entitled to coverage." *Id.* at 6–7. In an apparent contradiction of this finding, the court went on to rule that ANI had a duty to defend Whittaker and Textron: "[G]iven the possibility that the Facility Form in its original version is the applicable policy, it is at least plausible that the Policy will cover the EPA's demand for environmental testing and remediation." *Id.* at 8. As ANI fairly argues, this ruling put the cart before the horse by conflating the duty to defend with the existence of coverage in the first place.[1] Before a court can determine whether a policy imparts a duty to defend, an applicable policy must be identified. Although the court erred on this issue, it will affirm its finding that ANI has a duty to defend, but on a different ground.[2]

Whittaker and Textron, for their part, urge the court to reconsider its ruling that ANI is in compliance with the requirements of Mass. Gen. Laws. ch. 175, § 111A. The court on reflection agrees that the ruling is flawed.[3] The court

---

1. The court also acknowledges that it improperly placed the burden of proving the existence of coverage under the Policy on ANI.

2. ANI also took issue with the court's reading of Condition 13 of the Facility Form, which deals with the mechanisms by which the terms of a Policy may be altered or amended. The parties offer differing interpretations of Condition 13. While ANI argues that it allows the Policy to be amended through an endorsement issued to an insured's agent, Whittaker and Textron contend that the notice must be issued directly to the insured. The court originally found the interpretation of Condition 13 to be important in light of the

parties' dispute over whether Starmet had ever received notice of the Endorsement. The court notes that ANI has recently discovered evidence that Endorsement 112 was sent to the insured's Controller in July of 1990. Whittaker and Textron make the only argument available under the circumstances, that the evidence comes too late to be considered by the court. The resolution of this dispute is unnecessary for purposes of this opinion, for the reasons discussed below.

3. Whittaker and Textron also note that the Conclusion of the Memorandum and Order should have reflected that fact that their motion for summary judgment had been allowed

therefore vacates its Memorandum and Order of September 15, 2009, and enters the following findings and rulings.

## BACKGROUND

Textron and Whittaker are former owners and operators of the Nuclear Metals Site. Textron acquired the Site in 1959. In 1966, Textron sold the Site to Whittaker's Nuclear Metals Division. In 1972, the Site was acquired by a newly formed company (named Nuclear Metals, Inc.), which was later re-baptized Starmet Corporation (NMI/Starmet). From 1958 to at least 2003, the Nuclear Metals facility engaged in the research and manufacture of metals containing low-level radioactive substances. After 1972, Starmet manufactured armor-penetrating ammunition for the United States Army made from depleted uranium.[4]

On October 20, 1959, ANI (formerly Nuclear Energy Liability Insurance Association) issued Nuclear Liability Policy No. NF–44, providing coverage for Nuclear Metals, Inc., effective August 1, 1958.[5] The Policy, known as the "Facility Form," was in force from 1958 through at least 1997.[6] On February 6, 1990, ANI published Endorsement 112, which had a retroactive date of January 1, 1990.

On June 14, 2001, the Environmental Protection Agency (EPA) added the Nuclear Metals Site to the National Priorities List.[7] On July 23, 2001, the EPA sent a Notice of Potential Liability to Whittaker and Textron, naming them as potential responsible parties (PRPs) under the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), 42 U.S.C. § 9601, *et seq.* The EPA demanded that Whittaker and Textron investigate "the full nature and extent of Site-related contamination that exists at or near the Site" and warned of potential liability for response costs, including any expenses that it might incur.[8] The EPA stated that it was performing a preliminary site investigation and preparing a soil and groundwater sampling plan. It requested a payment of $185,015.21 for the response costs to date.

On February 19, 2002, the EPA sent a second letter to Whittaker and Textron warning again of the potential liability for response costs and requesting a Remedial

in its entirety, as they had sought only a determination that ANI had a duty to defend. Finally, Whittaker and Textron renew an argument that ANI's reduction of coverage violated the cancellation requirements of Mass. Gen. Laws. ch. 175, § 112.

4. Because the various owners and operators of the Site used and disposed of fissionable material, they fell under the regulatory jurisdiction of the Atomic Energy Commission (AEC) (now the Nuclear Regulatory Commission (NRC)).

5. As will be discussed below, there is a dispute as to the metes and bounds of the insured Site.

6. It is undisputed that Textron, Whittaker, and Starmet qualified as insureds under the Policy pursuant to Endorsement 7.

7. The National Priorities List is the EPA's list of high-risk hazardous waste sites eligible for long-term remedial action under the federal Superfund program.

8. The EPA's involvement came after many years of state environmental remediation efforts. In 1988, the Massachusetts Department of Environmental Quality Engineering, now the Massachusetts Department of Environmental Protection (DEP), sent a Notice of Responsibility (NOR) to Starmet. The DEP demanded that Starmet investigate and remedy uranium contamination at the Site. With $6.5 million in funding provided by the U.S. Army, Starmet began to investigate and carry out remediation, including a partial cleanup of an unlined holding basin into which waste solutions containing depleted uranium had been discharged.

Investigation and Feasibility Study (RI/FS). The EPA stated that "[h]azardous substances involved in the release or threat of release at the Site include, but is not limited to, beryllium and radioactive substances." The EPA informed Whittaker and Textron that it had determined that there may be an "imminent and substantial endangerment to public health, welfare, or the environment." The EPA announced plans to install a protective cover over areas that posed a potential threat and to conduct "sampling and analysis to delineate off-site contamination." The EPA "urge[d]" Whittaker and Textron to perform or finance the remediation steps. The following day, February 20, 2002, the EPA sent a "Special Notice Package" to Whittaker and Textron. The EPA demanded the payment of accumulated response costs in the amount of $779,553.81.

Whittaker and Textron entered into an Administrative Order by Consent with the EPA, effective June 18, 2003, and amended February 19, 2008.[9] The Consent Order contains numerous findings of fact, among them that

> [f]rom 1958 to the present, the Site was used by various operators at various times as a specialized research and metal manufacturing facility, which was licensed to possess low-level radioactive substances. At various times, Site operators used depleted uranium, beryllium, titanium, zirconium, copper, acids, solvents, and other substances at the Site. From 1958 to 1985, Site operators disposed of manufacturing by-products, including waste solutions containing depleted uranium mixed with copper, spent acid, and lime, into an unlined holding

basin located on-site. Other areas of the Site, including but not limited to a former cranberry bog, a cooling water recharge pond, septic leaching fields, a sweepings pile, and a small landfill, are also believed to have been used for the disposal of manufacturing wastes. . . .

Sampling of soils and groundwater beneath the Site revealed elevated levels of depleted uranium and elevated levels of beryllium. Sampling of sediments at the Site revealed elevated levels of depleted uranium, copper, and volatile organic compounds.

Based on its findings, the EPA determined that it was necessary to conduct the RI/FS "to determine the full nature and extent of Site-related contamination that *exists at or near* the Site and to determine what removal and/or remedial actions are necessary." (Emphasis added). In July of 2005 and October of 2006, Whittaker and Textron, respectively, tendered the EPA's demand(s) to ANI, which denied coverage on a number of grounds, among them that the Policy did not cover CERCLA response costs associated with the Site.

On March 3, 2006, the EPA sent another demand for payment and a Notice of Potential Liability to Whittaker and Textron. The demand letter stated that "[h]azardous substances involved in the release *or threat of release* at the Site include, but are not limited to, depleted uranium, beryllium, hydrofloric acid, polychlorinated bypenyls, copper, and volatile organic compounds." (Emphasis added). The EPA demanded $5,267,104.61 for remediation

---

9. In addition to Whittaker and Textron, the EPA negotiated the Consent Order with MONY Life Insurance Company, the U.S. Army, and the U.S. Department of Energy (DOE), all of whom had been named by the EPA as additional PRPs. Under the terms of the Consent Order, the Army and the DOE are responsible for ninety-eight percent of the remediation costs. Whittaker and Textron are responsible for the remaining two percent. Under CERCLA, PRPs are jointly and severally liable for remediation costs.

costs expended to date.[10]

## DISCUSSION

■ On cross-motions for summary judgment, "the court must consider each motion separately, drawing inferences against each movant in turn. Summary judgment is appropriate when there is no dispute as to any material fact and only questions of law remain." *Reich v. John Alden Life Ins. Co.*, 126 F.3d 1, 6 (1st Cir.1997) (internal citations omitted). Under Massachusetts law, the interpretation of a disputed insurance policy is a matter of law for the court. *See Nascimento v. Preferred Mut. Ins. Co.*, 513 F.3d 273, 276 (1st Cir.2008), citing *Herbert A. Sullivan, Inc. v. Utica Mut. Ins. Co.*, 439 Mass. 387, 394, 788 N.E.2d 522 (2003). *See also Ruggerio Ambulance Serv., Inc. v. Nat'l Grange Ins. Co.*, 430 Mass. 794, 797, 724 N.E.2d 295 (2000). In construing an insurance contract, the court follows the usual rules of contract interpretation. *Brazas Sporting Arms, Inc. v. Am. Empire Surplus Lines Ins. Co.*, 220 F.3d 1, 4 (1st Cir.2000).

■ In applying these rules, a court construes the words of an insurance policy in their usual and ordinary sense. *Specialty Nat'l Ins. Co. v. OneBeacon Ins. Co.*, 486 F.3d 727, 732 (1st Cir.2007). The court must "consider what an objectively reasonable insured, reading the relevant

policy language, would expect to be covered." *Hazen Paper Co. v. United States Fid. & Guar. Co.*, 407 Mass. 689, 700, 555 N.E.2d 576 (1990). "[A]mbiguous words or provisions are to be resolved against the insurer." *City Fuel Corp. v. Nat'l Fire Ins. Co. of Hartford*, 446 Mass. 638, 640, 846 N.E.2d 775 (2006).[11] On the other hand, "[a] policy of insurance whose provisions are plainly and definitely expressed in appropriate language must be enforced in accordance with its terms." *High Voltage Eng'g Corp. v. Fed. Ins. Co.*, 981 F.2d 596, 600 (1st Cir.1992) (citation omitted).

### 1. Deciding the Applicable Policy

#### A. The Facility Form

■ The Facility Form promised to pay on behalf of the insured "all sums which the insured shall become legally obligated to pay as damages because of . . . property damage caused by the nuclear energy hazard." The term "property damage" was defined as

physical injury to or destruction or radioactive contamination of property, and loss of use of property so injured, destroyed, or contaminated, and loss of use of property while evacuated or withdrawn from use because possibly so contaminated or because of imminent danger of such contamination.

"Nuclear energy hazard" is defined to include the "radioactive, toxic, explosive or

10. The EPA's letter noted a concern that the statute of limitations for the bringing of a CERCLA suit would arguably expire in April of 2006. The parties signed a tolling agreement.

11. This rule of construction has "particular force" when it comes to exclusions from coverage. *Hakim v. Mass. Insurers' Insolvency Fund*, 424 Mass. 275, 282, 675 N.E.2d 1161 (1997). "Interpretation of the language of the exclusion presents a question of law.... In this interpretation, we are guided by three fundamental principles: (1) an insurance contract, like other contracts, is to be construed according to the fair and reasonable meaning of its words; (2) exclusionary clauses must be strictly construed against the insurer so as not to defeat any intended coverage or diminish the protection purchased by the insured; and (3) doubts created by any ambiguous words or provisions are to be resolved against the insurer." *Camp Dresser & McKee, Inc. v. Home Ins. Co.*, 30 Mass.App.Ct. 318, 323–324, 568 N.E.2d 631 (1991) (internal citations omitted).

other hazardous properties of nuclear material" that is stored "at the facility or has been discharged or dispersed therefrom." "Nuclear material" is defined as including "source material, special nuclear material or byproduct material. "Source material" includes uranium and depleted uranium. The Facility Form additionally promised to defend "any suit against the insured alleging such bodily injury or property damage and seeking damages which are payable under the terms of this policy...." [12] Finally, Facility Form contains an exclusion clause. Exclusion (f) states that the Policy "does not apply ... to property damage to any property at the location designated in Item 3 of the declarations." [13]

ANI argues vigorously that the Facility Form must be viewed in the context in which it was drafted. ANI contends that the Facility Form is a "creature of statute," intended to carry out the legislative goals of the Price Anderson Nuclear Industries Indemnity Act of 1957 (Price Anderson Act). Congress's stated purpose in enacting the Price–Anderson Act was to "protect the public and ... encourage the development of the atomic energy industry...." 42 U.S.C. § 2012(i). The Price–Anderson Act was conceived in response to the risk of potentially vast liability in the event of a nuclear accident of a sizable magnitude.... Private industry and the AEC were confident that such a disaster would not occur, but the very uniqueness of nuclear power meant that the possibility remained, and the potential liability dwarfed the ability of the industry and private insurance companies to absorb the risk.... [S]pokesmen for the private sector informed Congress that they would be forced to withdraw from the field if their liability were not limited by appropriate legislation.

*Duke Power Co. v. Carolina Envtl. Study Group, Inc.*, 438 U.S. 59, 64, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978).[14] The Price–Anderson Act offered a major incentive to private power companies and private insurers to invest in nuclear power generation by limiting the aggregate liability for a single nuclear accident to $560 million. *See id.* at 65, 98 S.Ct. 2620. Nuclear power licensees were required to purchase a primary policy of privately underwritten insurance (then $60 million). The federal government agreed to act as an excess insurer, providing licensees with $500 million of indemnification over and above the primary policy. Licensees were relieved of any additional liability regardless of fault or causation. *Id.*[15]

---

12. Neither the term "suits" nor "damages" is defined in the Facility Form.

13. The declarations initially identified the "location" as a 29.7 acre portion of the Site. The declarations were amended in 1980 to expand the location to "[a]ll of the premises including the land and all buildings and structures owned, occupied by or rented to NMI and situated on a site consisting of approximately 38 acres situated on Route 62, West Concord, MA." The Site now encompasses 46 acres, but the Policy's declarations were never amended to reflect the acquisition of the additional acreage.

14. In *Duke Power*, the Supreme Court rejected the argument that the Price–Anderson Act violated the Due Process or Equal Protection Clauses. The Court agreed with the district court's finding that the nuclear power industry could not exist without the Act's protections, 438 U.S. at 75, 98 S.Ct. 2620, and that Congress's decision to place a ceiling on liability was not an arbitrary or irrational means of achieving the goal of fostering nuclear energy. *Id.* at 84, 98 S.Ct. 2620. The Court also found that the Act provided a reasonable and just substitute for state-tort remedies. *Id.* at 88, 98 S.Ct. 2620.

15. The most recent amendment of the Price–Anderson Act occurred in 2005 with the enactment of the Energy Policy Act of 2005, Pub.L. No. 109–58, 119 Stat. 779 (2005). The

ANI argues that it created the Facility Form to meet the demands placed on the insurance industry and licensees by the Price–Anderson Act. Under the NRC's regulations, proof of coverage under the Facility Form satisfies the primary insurance requirement imposed by the Act. *See* 10 C.F.R. § 140.15(a)(2). According to ANI, all licensees in the United States, and "many" other facilities handling nuclear materials, are insured under the Facility Form.[16]

ANI argues that if the Facility Form is interpreted to provide coverage for the "conventional" environmental cleanup of primary site contamination, ANI's ability to provide coverage for third-party claims in the event of a nuclear catastrophe would be severely, and possibly fatally, jeopardized. ANI's argument is grounded on the important issue of insurance industry solvency, but not on any actual conflict with the provisions of the Price–Anderson Act. The Act addresses the issue of solvency protection by placing limits on nuclear accident liability; it is not, however, a "nanny" Act—it does not prohibit insurers from undertaking to provide coverage to nuclear plant operators for "conventional" environmental harm should they choose to do so (wisely or not). The Act leaves it to insurers to negotiate with insureds the terms of a nuclear policy like the Facility Form. It does not dictate the contents of the policy itself. *See* 10 C.F.R. § 140.91, App. A (2001) ("Publication of [the Facility Form] should not be construed as a Commission endorsement of any particular provision pertaining solely to the business relationship between the insurers and the insureds or to any other matter not in the Commission's statutory jurisdiction under the Atomic Energy Act.").[17]

Consistent with the principles governing contract interpretation, the court looks to the terms of the Facility Form. "Property damage" is defined in the Facility Form as "physical injury to or destruction or radioactive contamination of property...." There is nothing in this language that would lead a reasonable insured to conclude that the words "destruction" or "radioactive contamination" of property would not include environmental harms.

The only reported case interpreting the Facility Form agrees. In *Aetna Cas. & Sur. Co. v. Kentucky,* 179 S.W.3d 830, 839 (Ky.2006) (*Maxey Flats* ), the Kentucky Supreme Court held that environmental cleanup costs generally were covered un-

---

liability of individual operators was increased to $300 million. While the federal government no longer contributes directly to the insurance pool, Congress has agreed to take whatever actions might be necessary to satisfy any excess private claims. To date all claims—including those originating from the Three Mile Island incident—have been satisfied by the primary insurers. The total payout as of 2000 totaled $151 million, while the pool of private funds theoretically available as of 2008 was $11.6 billion. (Licensees are not required to pay into the fund until an accident occurs). The Energy Policy Act of 2005 extended the Price–Anderson Act through the end of 2025. *See* Prof. Dr. Michael G. Faure and Dr. Tom Vanden Borre, *Compensating Nuclear Damage: A Comparative Analysis of the U.S. and International Liability Schemes,* 33 Wm. & Mary Envtl. L. & Pol'y Rev. 219, 220–221 (2008).

**16.** The court notes that the Nuclear Metals facility does not house a nuclear power reactor and is not a "nuclear power plant." The facility is subject to regulation and oversight by the NRC because of its handling of nuclear materials.

**17.** CERCLA was not enacted until 1980, well after the 1957 enactment of the Price–Anderson Act. The court finds it significant that in the numerous amendments to the Act since CERCLA's passage, Congress has not seen it fit or necessary to forbid primary insurers from offering coverage for "conventional" environmental harms.

der ANI's Facility Form as originally issued.[18] *Maxey Flats* involved a chemical and nuclear waste facility in Fleming County, Kentucky, which had served as a disposal site for large quantities of low-level radioactive waste generated by nuclear power plants, hospitals, universities, and other users of nuclear materials. Despite trench disposal practices that were deemed acceptable at the time, rain water eventually caused the buried waste to leach into the groundwater.

The Court first rejected ANI's argument that because the Facility Form provided a defense only against a "suit," the administrative notice from the EPA did not trigger a defense obligation.[19] The Court noted that

> [t]he existence of a statutory system [CERCLA] designed to forgo litigation, while achieving the same relief, minimizes the distinction between administrative claims and formal legal proceedings. "Coverage should not depend on whether the EPA may choose to proceed with its administrative remedies or go directly to litigation."

*Id.* at 837–838, quoting *Aetna Cas. & Sur. Co. v. Pintlar Corp.*, 948 F.2d 1507, 1517 (9th Cir.1991).

The Court next ruled that the term "damages" under the Facility Form included "government mandated response or cleanup costs under CERCLA and similar state environmental protection statutes: as long as the purpose is to rectify, correct, control, lessen or stop ongoing injury of the premises." *Id.* at 839. Finally, the Court ruled that Exclusion (f) did not preclude coverage for all property damage to the Maxey Flats site itself, as "common sense would mandate … the most effective method of preventing additional harm to the property of others or to public waters would be to target the site of the harm, though it may be on-site, to prevent further contamination via run off to off-site locations." *Id.* at 840.[20] This court agrees with the reasoning of the Kentucky Supreme Court in *Maxey Flats*.[21]

### B. *Endorsement 112*

■ The Insuring Clause of Endorsement 112 provides that ANI will pay

> on behalf of the insured all sums which the insured shall become legally obligat-

---

**18.** ANI issued Endorsement 112 in response to the *Maxey Flats* case.

**19.** Maxey Flats, like the Nuclear Metals Site, had been placed by the EPA on the National Priorities List and was the subject of an administrative remediation enforcement action.

**20.** In *Maxey Flats*, the parties stipulated that 2.6 percent of the total response costs were designed to the cleanup of damage restricted solely on site. The Court therefore affirmed the lower court's finding that 2.6 percent of the total response costs were subject to Exclusion (f). *Id.*

**21.** ANI seeks to offer extrinsic evidence to support its argument that the Facility Form was intended to cover only off-site third-party claims for damages. An internal memorandum circulated within Marsh and McClennan

(Marsh), the agent for the Nuclear Metal insureds, suggests that Marsh believed that the Facility Form did not extend coverage to include environmental cleanup costs. Also proffered is an undated comment attributed to the NRC's Executive Director for Operations to the same effect. ANI also argues that the absence of any prior claims on the part of the insureds for cleanup costs at the Site confirms their understanding that the claims were not covered. For example, ANI notes that NMI Starmet, despite being held responsible for a multi-million dollar cleanup at the Site in the 1980's, never made a claim under the Policy (this despite an imminent filing for bankruptcy protection). ANI additionally notes that Whittaker did not submit the present claim until 2005, four years after being identified as a PRP. The court will rely on the unambiguous language of the Facility Form rather than the extrinsic evidence.

ed to pay as covered damages because of bodily injury or property damage, or as covered environmental cleanup costs because of environmental damage.

"Covered damages" are defined as

damages because of bodily injury or property damage to which this policy applies; **but covered damages do not include environmental cleanup costs or on-site cleanup costs.**

(Emphasis added). "Environmental cleanup costs," in turn, are defined as

all loss, cost or expense arising out of any governmental decree, order or directive (other than an award of covered damages in an action at law) requiring or requesting a person or organization to undertake or pay for monitoring, testing for, cleaning up, neutralizing or containing contamination of the environment, whether the contamination is on, above or below the surface of the ground.

The term "environment" as defined by the Endorsement includes the "land, the atmosphere, and all watercourses, bodies of water and natural resources, whether on, above or below the surface of the ground." "Covered environmental cleanup costs" are limited to

only those environmental cleanup costs which are incurred directly for monitoring, testing for, cleaning up, neutralizing or containing environmental damage as a result of a transportation incident; but covered environmental cleanup costs do not include on-site cleanup costs.[22]

"On-site property damage" is defined as "all property damage to property at the facility, ... whether the property is on, above or below the surface of the ground

...." "On-site cleanup costs" are costs arising out of

obligations ... imposed by common law or otherwise, to undertake or pay for monitoring, testing for, cleaning up, neutralizing or containing contamination by nuclear material at the facility, whether the material is on, above or below the surface of the ground.

Finally, Endorsement 112 provides that ANI's duty to defend

shall be limited, ... if the claim or suit also seeks any of the following, which in no event shall be construed as covered by this policy: (1) damages for on-site property damage; (2) recovery of on-site cleanup costs or any other cleanup costs except covered environmental cleanup costs; (3) performance of an insured's environmental protection obligations or on-site cleanup obligations.

As clear as it is that the Facility Form provides coverage for environmental cleanup costs, it is equally clear that Endorsement 112 excludes them. The court agrees with ANI that no reasonable interpretation of the language of the Endorsement could lead to any other result.

*Statutory Issues*

▆ Because the Facility Form provides coverage for environmental clean up costs and Endorsement 112 does not, the issuance of the Endorsement represented a reduction in (or more accurately, an elimination of) coverage. In Massachusetts,

[i]n the event a company or filing or rating organization eliminates or reduces certain coverages, conditions or definitions in such policies issued under this section, the company must attach to each of such policy a printed notice setting forth what coverages, conditions or

---

**22.** The parties agree that there are no cleanup costs at issue resulting from a "transportation incident."

definitions have been eliminated or reduced. If explanations of such reduced or eliminated coverages are not contained in such a printed notice attached to such policy, then such coverages, conditions or definitions shall remain in full force and effect without such reductions and eliminations.

Mass. Gen. Laws ch. 175, § 111A. It is undisputed that no printed notice specifying a reduction in or elimination of coverage accompanied the Endorsement. Although ANI argues that section 111A does not apply because Endorsement 112 was a "new" policy rather than an amendment of an existing policy, that argument is belied by ANI's own description of what was intended. Endorsement 112 is entitled "Amendatory Endorsement" and is numbered "Endorsement No. 112" to "Policy No. NF–44." The Endorsement by any name is an amendment to the existing policy and it is incredulous for ANI to insist otherwise.[23]

This brings us to the Whittaker and Textron motion for reconsideration. Whittaker and Textron argue that the court's prior ruling finding ANI in compliance with Mass. Gen. Laws ch. 175, § 111A, is flawed because it effectively ignored the purpose of the "notice" and "attachment" requirements of the statute. Upon reflection, the court agrees. The intent of the statute is to give clear notice to an insured of a loss or reduction of coverage. The effect of Endorsement 112 was to narrow the scope of coverage provided under the Facility Form (as interpreted by *Maxey Flats*). The court agrees with Whittaker and Textron that Endorsement 112 was not properly issued because it did not strictly comply with section 111A's notice requirements. There was no "explanation," as required by the statute, as to how the Policy's coverage was reduced or eliminated. The absence of such an explanation is, of course, logical, given ANI's long-held position that Endorsement 112 was merely an affirmation of existing coverage and not a reduction in that coverage.[24]

*Policy Interpretation*

▇▇▇ Because the court has determined that ANI did not comply with section 111A, Endorsement 112 was not validly issued. The court will therefore rely on the Facility Form in interpreting the nature and extent of ANI's obligations to

---

23. In the alternative, ANI argues that Endorsement 112 did not reduce coverage under the Facility Form, but rather, as noted in an "Explanatory Memorandum" accompanying the Endorsement, was merely "a restatement of the present coverage for property damage liability claims in a new format." The Explanatory Memorandum acknowledged that there may be "differences in opinion between insureds and [ANI] about the interpretation and application of [ANI's] liability insurance policies to claims that are subject to the proposed endorsements."

24. Whittaker and Textron additionally claim that ANI violated Mass. Gen. Laws ch. 175, § 112, which provides, in pertinent part:
[t]he liability of any company under . . . any . . . policy insuring against liability for loss or damage . . . on account of damage to property, shall become absolute whenever the loss or damage for which the insured is responsible occurs, and the satisfaction by the insured of a final judgment for such loss or damage shall not be a condition precedent to the right or duty of the company to make payment on account of said loss or damage. No such contract of insurance shall be cancelled or annulled by any agreement between the company and the insured after the said insured has become responsible for such loss or damage, and any such cancellation or annulment shall be void.
Given the court's ruling with respect to section 111A, it need not—at least for present purposes—decide the applicability of section 112. The court notes that whether section 112 applies depends on when the environmental damage at issue occurred, a question of fact that cannot be resolved on summary judgment.

Whittaker and Textron, including the existence of a duty to defend. An insurer in Massachusetts has a duty to defend its insured

> if the allegations in the [third-party] complaint are reasonably susceptible of an interpretation that they state or adumbrate a claim covered by the policy terms.... Otherwise stated, the process is one of envisaging what kinds of losses may be proved as lying within the range of allegations of the complaint, and then seeing whether any such loss fits the expectation of protective insurance reasonably generated by the terms of the policy.

*Sterilite Corp. v. Continental Cas. Co.*, 17 Mass.App.Ct. 316, 318, 458 N.E.2d 338 (1983) (internal citations and quotation marks omitted). "It is axiomatic that an insurance company's duty to defend is broader than its duty to indemnify.... The obligation of an insurer to defend is not, and cannot be, determined by reference to the facts proven at trial. Rather, the duty to defend is based on the facts alleged in the complaint and those facts which are known by the insurer." *Boston Symphony Orchestra, Inc. v. Commercial Union Ins. Co.*, 406 Mass. 7, 10–11, 545 N.E.2d 1156 (1989), citing *Desrosiers v. Royal Ins. Co.*, 393 Mass. 37, 40, 468 N.E.2d 625 (1984).

> The underlying complaint need only show, through general allegations, a possibility that the liability claim falls within the insurance coverage. There is no requirement that the facts alleged in the complaint specifically and unequivocally make out a claim within the coverage. However, when the allegations in the underlying complaint lie expressly outside the policy coverage and its purpose, the insurer is relieved of the duty to investigate or defend the complaint.

*Herbert A. Sullivan, Inc.*, 439 Mass. at 394, 788 N.E.2d 522.

■ Under Massachusetts law, ANI must provide a defense for Whittaker and Textron if there is even a remote chance that the Facility Form adumbrates the EPA's demand. *See Millipore Corp. v. Travelers Indem. Co.*, 115 F.3d 21, 35 (1st Cir.1997) ("The possibility of coverage is sufficient to trigger the duty to defend."). Courts generally place the duty to defend "all counts on an insurer which has a duty to defend at least one count of a complaint, barring a contrary agreement with the insured." *Aetna Cas. & Sur. Co. v. Cont'l Cas. Co.*, 413 Mass. 730, 732 n. 1, 604 N.E.2d 30 (1992).

■ The first issue—whether the EPA's demand is a "suit" under the Facility Form—was affirmatively answered in *Maxey Flats*. In a similar context, the Massachusetts Supreme Judicial Court (SJC) held that

> the EPA processes for the enforcement of obligations to aid in the cleaning up of environmental pollution have moved away from the use of lawsuits toward the use of agency demands for participation in remedial action. Those requests are dangerous for the polluter to ignore because they often result in dispositive, extrajudicial solutions. The consequences of the receipt of the EPA letter were so substantially equivalent to the commencement of a lawsuit that the duty to defend arose immediately.

*Hazen Paper*, 407 Mass. at 695–696, 555 N.E.2d 576. *See also Am. Policyholders Ins. Co. v. Nyacol Prods., Inc.*, 989 F.2d 1256, 1258 (1st Cir.1993) (noting that Massachusetts law "deems PRP notices equivalent to law suits for the purpose of triggering an insurer's duty to defend.").

■ The second issue involves the import of Exclusion (f), which bars coverage

for "property damage to any property at the location." Under Massachusetts law, the owned property exclusion, while it relieves an insurer from liability for costs incurred solely for the purpose of remediating the insured property, does not exclude cleanup costs "incurred to remediate or prevent further migration of ... contaminants to ... off-site waterways." *Hakim v. Mass. Insurers' Insolvency Fund*, 424 Mass. 275, 282, 675 N.E.2d 1161 (1997). In *Hakim*, the SJC aligned Massachusetts law with "numerous" other state and federal decisions holding that the exclusion "does not relieve the insurer of all liability for response costs incurred by the cleanup of the policyholder's own property ... if the cleanup is designed to remediate, to prevent or to abate further migration of contaminants to the off-site property." *Id.* at 279–280, 675 N.E.2d 1161.[25]

The same reasoning lies at the heart of the *Maxey Flats* decision.

> [T]he weight of authority favors coverage under liability policies for remediation expenses when the primary intent is to prevent additional harm to the property of others or to public waters. We recognize also that common sense would mandate in this scenario the most effective method of preventing additional harm to the property of others or to public waters would be to target the site of the harm, though it may be on-site, to prevent further contamination via runoff to off-site locations.

*Aetna Cas.*, 179 S.W.3d at 840. *See also Rubenstein v. Royal Ins. Co. of Am.*, 44 Mass.App.Ct. 842, 853, 694 N.E.2d 381

(1998) ("Here the problem arises because there has been damage to the insured's property as well as to third-party property, and the costs associated with preventing further contamination extend to both."); *Allstate Ins. Co. v. Quinn Constr. Co.*, 713 F.Supp. 35, 41 (D.Mass.1989), *vacated due to settlement*, 784 F.Supp. 927 (D.Mass.1990) ("In the unique context of environmental contamination, where prevention can be far more economical than post-incident cure, it serves no legitimate purpose to assert that soil and groundwater pollution must be allowed to spread over property lines before they can be said to have caused the damage to other people's property which liability insurance is intended to indemnify."). *Compare Walsh v. Hingham Mut. Fire Ins. Co.*, 2008 WL 2097384 at *5 (Mass.Super. Feb. 29, 2008) (denying an insured's right to indemnification in the absence of any demonstrable damage to neighboring property, or any imminent or substantial threat of damage).

ANI argues that even under a generous extrapolation of the *Hakim* decision, Exclusion (f) still precludes coverage because there is no physical evidence that contamination has occurred outside the boundaries of the Site. Whittaker and Textron in rebuttal point out that the EPA has taken a different position in demanding the investigation and remediation of "Site-related contamination that exists at or near the Site." ANI correctly notes that the EPA's demand letters do not directly allege any off-site migration and argues that a duty to defend should not be triggered by a "theoretical" possibility. The issue is unresolved under Massachusetts law. In

---

**25.** The result was anticipated by the Superior Court in *United Techs. Corp. v. Liberty Mut. Ins. Co.*, 1993 WL 818913 at *11 (Mass.Super. Aug. 3, 1993) ("With current knowledge of the migration of groundwater and the ability to measure and determine the speed and direction of flow, it is not likely that the Massachusetts appellate courts would apply the owned-property exclusion to contaminated groundwater.... Where contamination of groundwater is limited to the property of the insured, there may be coverage for cleanup costs to prevent imminent harm or to mitigate harm to the property of another even in the absence of a third-party claim.").

*Hakim,* where there was undisputed evidence of the contamination of waterways adjacent to the insured property, the SJC found no reason to consider "whether the owned property exclusion bars coverage if there is an imminent threat of, but no actual contamination of, the property of another." *Id.,* 424 Mass. at 280 n. 8, 675 N.E.2d 1161.

ANI's argument, however, fails for two reasons. Under Massachusetts law, the duty to defend arises even if there is only a possibility of an insured's being found liable for a claim. Here the only impediments to liability would arise if the SJC—contrary to indications [26]—decides that the threat of harm to adjacent property is insufficient in and of itself to trigger liability *and* if the EPA (or other expert authority) concludes that groundwater migration of nuclear and other contaminants has not in fact occurred (or at least is not imminent).[27]

The EPA has taken the position that such migration has likely already taken place. In a notice dated September 26, 2002 (submitted by ANI in support of its motion), the EPA stated that the local

[g]roundwater is contaminated with depleted uranium, nitrate, and [volatile organic compounds]. . . . Discharge of contaminated groundwater, and contaminated surface water runoff, has the potential to reach the Assabet River, which is located approximately 300 feet downgradient from the site boundary. . . . Wetlands adjacent to the Assabet River were not tested for uranium, but historical data indicates contamination was reaching a wetland tributary. . . .

It bears repeating that "the allegations against the insured must only be reasonably susceptible of an interpretation that they state a claim covered by the policy; a factual dispute as to whether there was actual off-site contamination will not prevent the court from finding the insurer owes its insured a duty to defend." *Preferred Mut. Ins. Co. v. Gordon,* 2003 WL 21077026 at *7 (Mass.Super. May 13, 2003).[28]

## ORDER

The court *VACATES* its Memorandum and Order dated September 15, 2009. For

---

**26.** In *Hakim,* the Court found a dispute of material fact raised by the plaintiffs' production of an environmental engineering report warning of "a threat of further contamination of the adjacent waters unless the contaminated soil was removed [from the insured property]." 424 Mass. at 283, 675 N.E.2d 1161. The accompanying citation to *Figgie Int'l, Inc. v. Bailey,* 25 F.3d 1267 (5th Cir.1994), is also telling. In *Figgie,* the Court of Appeals approved a grant of summary judgment where the insured had "failed to submit *any* evidence" that hazardous material was capable of leaking into groundwater. *Id.* at 1272 (emphasis in the original). Here, there can be no dispute that radioactive material is capable of leaking from an unlined in-ground basin into the adjacent soil.

**27.** This is an issue of fact on which Whittaker and Textron bear the ultimate burden of proof. *See Hakim,* 424 Mass. at 283 n. 13,

675 N.E.2d 1161, citing *Markline Co. v. Travelers Ins. Co.,* 384 Mass. 139, 140, 424 N.E.2d 464 (1981). Should they fail to meet this burden, that would extinguish any duty on the part of ANI to indemnify their losses.

**28.** Whittaker and Textron also assert the usual claims for violations of Mass. Gen. Laws chs. 93A and 176D. Chapter 93A provides a cause of action for any person who has been harmed by unfair or deceptive acts in commerce. *Id.,* § 11. Chapter 176D, in turn, prohibits certain "unfair claims settlement practices." Mass. Gen. Laws ch. 176D, § 3(9). The court can easily dispose of these claims because there is no hint in the record of any unreasonable or unfair act on the part of ANI. "An insurance company which in good faith denies a claim of coverage on the basis of a plausible interpretation of its insurance policy is unlikely to have committed a violation of G.L. c. 93A." *Gulezian v. Lincoln*

the reasons set out in this substitute decision, ANI's motion for summary judgment is *ALLOWED* in part, and *DENIED* in part. ANI's motion is *ALLOWED* with respect to the claims for violations of Chapters 93A and 176D. These claims are *DISMISSED*. Whittaker's and Textron's cross-motion for partial summary judgment is *ALLOWED*. The court finds that ANI has a duty to defend Whittaker and Textron unless or until a competent tribunal enters a conclusive finding that no migration of contaminants from the Site has occurred or is imminent. Within fourteen (14) days from the date of this Order, the parties will file a joint status report setting out a proposed schedule for the resolution of any remaining issues in this litigation.

SO ORDERED.

*Ins. Co.*, 399 Mass. 606, 613, 506 N.E.2d 123 (1987). As the court's opinion demonstrates, it is by no means an open and shut issue whether coverage exists at all, despite the court's finding that it does. Whittaker tendered its claim to ANI on July 22, 2005, and ANI responded promptly on September 9, 2005. (The record is not clear when ANI responded to Textron's claim, which was tendered on October 26, 2006). Because there is a "a paucity of proof that [ANI acted in a manner that was] coercive, unfair, or unreasonable," *Pandey v. Paul Revere Ins. Co.*, 34 Mass.App.Ct. 919, 920, 609 N.E.2d 98 (1993), the court will *ALLOW* ANI's motion to dismiss the Chapter 93A and Chapter 176D claims.